**ARMSTRONG CLEANERS, INC. and Forest Richard Armstrong and Betty L. Bell Armstrong d/b/a/ Armstrong Cleaners and Muncie One Hour Cleaners, Plaintiffs,**

v.

**ERIE INSURANCE EXCHANGE, a member of the Erie insurance Group, Defendant.**

No. 1:03CV1721DFHTAB.

United States District Court, S.D. Indiana, Indianapolis Division.

March 15, 2005.

798

Thomas A. John, Michael Orville Nelson,
Hunsucker & Goodstein, for plaintiffs.

Mark R. Smith, Smith Fisher Maas & Howard, for defendant.

## ENTRY ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

HAMILTON, District Judge.

This case presents a recurring conflict of interest question within law's "eternal triangle"—the liability insurance company, the insured, and the insurance defense attorney. The question is whether an insurer's reservation of rights created a conflict of interest sufficient to entitle the policyholders to have their insurer pay attorneys of the policyholders' choice to defend them in the underlying litigation. As explained below, the court finds that the reservation of rights posed, in the terms of Rule 1.7(a)(2) of the Indiana Rules of Professional Conduct, "a significant risk" that representation of the policyholders by attorneys chosen by the insurer would be materially limited by the attorneys' responsibilities to the insurer. As a result, the policyholders are entitled to select their own counsel to defend the underlying claim, subject to reasonable approval by the insurer, with reasonable fees and expenses paid by the insurer.

Plaintiffs Armstrong Cleaners, Inc. and Forest and Betty Armstrong (collectively the "Armstrongs") operated a dry cleaning business in Muncie, Indiana from 1989 until 1996. The Armstrongs are now defendants in lawsuits seeking to hold them responsible for environmental contamination at the sites of two of their cleaning establishments. During the relevant period the Armstrongs were insured under a liability insurance policy issued by defendant Erie Insurance Exchange ("Erie"). The Armstrongs promptly tendered the defense of the case to Erie. Erie agreed to defend the Armstrongs but under a reservation of rights as to coverage and the duty to defend.

Erie insists on using counsel of its choice to defend the Armstrongs in the underlying lawsuits. The Armstrongs contend that counsel selected by Erie will have a conflict of interest because issues as to which Erie has reserved its rights are likely to be litigated and decided in the underlying lawsuits. The Armstrongs have filed suit to force Erie to pay for counsel of their choice. They also assert a claim for bad faith denial of coverage under *Erie Insurance Co. v. Hickman by Smith*, 622 N.E.2d 515 (Ind.1993). Erie has moved for summary judgment on both issues. The Armstrongs have moved for summary judgment on the issue of selection of counsel. This court has jurisdiction under 28 U.S.C. § 1332.[1]

### Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the nonmoving party. *Anderson v. Liberty Lob-*

---

1. The stipulated facts show that all plaintiffs are citizens of Indiana and that there is only one defendant, which is a citizen of Pennsylvania. The stipulated facts removed some ambiguities presented in the pleadings as to the number and citizenship(s) of the defendant(s).

*by, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Baron v. City of Highland Park,* 195 F.3d 333, 337–38 (7th Cir.1999).

### Undisputed Facts

The parties have stipulated to essentially all material facts. Forest and Betty Armstrong operated a family dry cleaning business known at different times as Armstrong Cleaners, Muncie Dry Cleaners, and Muncie One Hour Cleaners in Muncie, Indiana from 1989 through 1996. Stipulated Facts ("SF") ¶¶ 4,5. One of the locations was on Tillotson Avenue in Muncie. SF ¶ 11. From March 27, 1989 through March 27, 1996, the Erie Insurance Company covered the Tillotson location with an Ultraflex Package Policy ("the Policy") issued to the Armstrongs. SF ¶¶ 10–11.[2]

Coverages "F" and "G" of the Policy protected the Armstrongs from liability arising from personal injury and property damage. These provisions state in relevant part:

> We will pay for damages because of personal injury or property damage for which the law holds anyone we protect responsible and which are covered by your policy. We cover only personal injury and property damage which occurs during the policy period. The personal injury or property damage must be caused by an occurrence which takes place in the covered territory.
>
> \*     \*     \*     \*     \*     \*
>
> We may investigate or settle any claim or suit for damages against anyone we protect, at our expense. If anyone we protect is sued for damages covered by this policy, we will defend with a lawyer we choose, even if the allegations are not

true. Our obligation to pay any claim or judgment or defend any suit ends when we have used up our limit of protection by paying judgments or settlements under Coverages F, G, H or I.

Ex. A at 20; Ex. B at 17–18. The Policy defines the term "occurrence" as "an accident, including continuous or repeated exposure to the same general, harmful conditions." Ex. A at 6; Ex. B at 6.

The Policy also contains an exclusion for "expected or intended acts":

> We do not cover under Personal Injury Liability (Coverage F), Property Damage Liability (Coverage G) and Medical Payments (Coverage I):
>
> (1) injury or damage expected or intended from the standpoint of anyone we protect. This does not apply to personal liability or property damage resulting from your protecting persons or property.

Ex. A at 21; Ex. B at 18.

The Policy also contains "pollution" exclusions:

> We do not cover under Personal Injury Liability (Coverage F) and Property Damage Liability (Coverage G):
>
> \*     \*     \*     \*     \*     \*
>
> (2)(a) damages arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
>
> 1.  at or from premises you own, rent or occupy;
>
> 2.  at or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste;
>
> 3.  which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for

---

**2.** The Armstrongs also face a claim related to environmental contamination at another site where they operated a dry cleaner, on Janney Avenue in Muncie, Indiana. See Stip. of Authenticity ¶ 1, Ex. S.

you or any person or organization for whom you may be legally responsible; or

4. at or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations:

a. if the pollutants are brought on or to the site or location in connection with such operations; or

b. if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

Ex. A at 22; Ex. B at 19. "Pollutants" are defined as "any solid, liquid, gaseous or thermal irritant or contaminant; including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned, or reclaimed." Ex. A at 6; Ex. B at 6.

The Armstrongs leased the Tillotson location from the property's owner, Mary Ivey. Before and after the lease with the Armstrongs, Ivey leased the property to Ronald and Carol Ray, who also operated a dry cleaning business at the site. Exs. C, D. In 2002, the Indiana Department of Environmental Management notified Ivey and the Rays that the Tillotson location was a potential source of soil and groundwater contamination and that they were "potentially responsible parties" ("PRPs") pursuant to Indiana law. *Id.* Ivey filed a complaint in the Southern District of Indiana on September 4, 2002 for damages and declaratory relief against her insurance carrier, State Farm Insurance, relating to the alleged contamination at the Tillotson location.[3]

State Farm then filed a third party complaint on May 22, 2003 for a declaratory judgment and damages against Muncie Dry Cleaners, the Rays, the Armstrongs, and their insurers. SF ¶¶ 15–18, Exs. C, D. State Farm claims that the Armstrongs and other defendants are "responsible for the investigation and environmental cleanup, and all other costs relating to the existence of contamination at or from the Property arising from dry cleaning chemicals" at the Tillotson location, and that State Farm is entitled to contribution "from other insurance carriers and/or other responsible parties, including but not limited to, Ray and/or Armstrong." SF ¶ 18, Ex. D. State Farm brought its third-party complaint against the Armstrongs pursuant to Ind.Code §§ 13–30–9–2, 13–30–9–3, and 13–30–9–5, discussed in detail below. Ex. D, ¶¶ 33–35.

The Armstrongs notified Erie of the third party complaint by letter dated June 4, 2003, and asked Erie to defend them. SF ¶ 19, Ex. E. On June 18, 2003, Erie responded in two ways. First, at Erie's request, attorney John Trimble of the firm of Lewis & Wagner entered an appearance for the Armstrongs in the State Farm matter. Second, Erie sent a letter to the Armstrongs stating that it would defend them in the State Farm litigation, but under a reservation of rights. The letter stated that Erie reserved all rights to deny "liability and coverage" for the Tillotson location, pending investigation of grounds for potential denial of coverage. As grounds for potential denial of coverage, the letter identified: (a) the Policy's definition of a covered "occurrence," (b) the Policy's "expected or intended acts" exclusion, and (c) the Policy's "pollution" exclusion. Erie also included a "blanket" reservation of its right to assert any other ground for denying coverage and/or liability that might be discovered during Erie's investigation. SF ¶ 20, Ex. F. Finally, Erie reserved the right "to seek judicial resolution of the coverage issues by way of Declaratory or other legal proceedings

---

**3.** *Ivey v. State Farm Fire & Cas. Co.,* Case No. 1:02–cv–1369 SEB–VSS.

during the pendency of or upon conclusion of the claim." _Id._[4]

In the June 18th letter, Erie also told the Armstrongs that they might wish to retain private counsel at their own expense:

> Because of the possibility that some or all other claims asserted in the underlying claims may not be covered by the policy, or if coverage may result in an award of damages that exceeds the coverage provided by such policy, or the possibility that your failure to comply with policy conditions may relieve Erie Insurance from any liability that they may have had to Forest Armstrong, doing business as Armstrong Cleaners, with respect to this claim, you may wish to retain private counsel, at your own expense, to represent your interests in this action.

Ex. F.

In a letter dated July 21, 2003, Erie told the Armstrongs that it had hired attorney Trimble to defend them against State Farm's third party complaint. SF ¶ 21, Ex. G. Erie had not consulted with the Armstrongs on their choice of counsel. Forest Armstrong Dec. ¶ 5.

The Armstrongs responded to Erie's July 21st letter with a letter dated August 14, 2003, asserting that they were entitled to select their own independent counsel, Michael Nelson of Hunsucker & Goodstein, and that Erie was required to pay Nelson's attorney fees and expenses. SF ¶ 22, Ex. H. The Armstrongs stated that they were willing to allow Nelson to work cooperatively with Trimble and Lewis & Wagner on the defense, but that any decisions regarding strategy would be at the Armstrongs' discretion, in conjunction with Nelson. _Id._ Hunsucker & Goodstein billed

Erie for attorney fees and disbursements incurred in the defense of the Armstrongs in letters dated October 2, October 30, and November 21, 2003, and January 5, 2004. SF ¶¶ 24, 26, 28, 32, Exs. J, L, N, Q. The earliest date for which Hunsucker & Goodstein requested payment for legal services performed on behalf of the Armstrongs in connection with the State Farm action was July 1, 2003, which was after Trimble entered his appearance. SF ¶ 24, Ex. J. (This court's records from the State Farm case show that Nelson's law firm received electronic notice of Trimble's appearance.)

Erie did not agree to the Armstrongs' proposal. Erie maintained that it would provide counsel from Lewis & Wagner to defend the Armstrongs, and that if the Armstrongs wished to have additional private counsel, it would be at their own expense. SF ¶ 23, Ex. I. By correspondence dated October 6, November 14, and November 28 of 2003, and January 12 of 2004, Erie denied any responsibility to pay Nelson's fees and expenses. SF ¶¶ 25, 27, 29, 33, Exs. K, M, O, R.

On October 10, 2003, the Armstrongs filed this action in state court seeking a declaratory judgment and damages against Erie. On November 20, 2003 Erie removed the action to this court, Beginning in May 2004, the parties began briefing the pending motions for summary judgment.

On August 11, 2004, Lewis & Wagner addressed a letter to the Armstrongs and attorney Nelson stating that after consultation with Erie, Dale Eikenberry of the firm Wooden & McLaughlin in Indianapolis would take over the defense of the environmental suit. That has now happened. Erie and the two law firms did not consult with or seek the approval of the Armstrongs for the change in counsel.

---

4. Erie notified the Armstrongs on February 26, 2004 that it would defend them in the Janney Avenue location lawsuit without a reservation of rights "until or unless the investigation reveals an issue where a reservation of rights would be appropriate." Stip. of Authenticity ¶ 2, Ex. T.

At an unspecified time before June 18, 2004, Erie "split its file" between the defense and coverage issues, assigning one set of issues to one adjuster and the other set of issues to another adjuster. Parker Aff. ¶ 7. Both adjusters work in the Indianapolis claims office. The two adjusters maintain their own files and do not have access to the other's file, and the two adjusters are prohibited from talking about this matter with one another. *Id.,* ¶ 9. There is no indication, however, that the "Chinese Wall" extends any higher than those two adjusters to include their supervisor(s) or others who would exercise final authority for Erie on issues that might arise, such as settlement or other major strategic decisions. Also, the defense adjuster has a copy of the reservation of rights letter that identifies the coverage issues.

*Discussion*

■ Indiana law applies to this diversity action. The Supreme Court of Indiana has not directly addressed the controlling issues here. This court's duty is to use available Indiana law to predict how the Supreme Court of Indiana would resolve those issues. See, *e.g., General Accident Ins. Co. of America v. Gonzales,* 86 F.3d 673, 675 (7th Cir.1996).

The Armstrongs' amended complaint in this action asks the court: (1) to declare that Erie is required to pay for counsel selected by the Armstrongs to defend them against State Farm's third party complaint; and (2) to award the Armstrongs compensatory and punitive damages and attorney fees for Erie's alleged bad faith actions. The court considers each claim in turn.

I. *Independent Counsel Claim*

A. *The Issue*

■ The problem here is one that arises often when a liability insurer cannot be confident at the outset of litigation whether the insured's actions are covered by the liability insurance policy. An insurer who faces such uncertainty has four options. First, it may decide to ignore its doubts and simply provide a defense and coverage under the policy. Second, an insurer that is confident the claim is not covered may simply deny coverage and a defense, leaving the insured to fend for himself. If the insurer turns out to be wrong on the issue of coverage, though, the insurer will be estopped from challenging the insured's handling of the underlying case, will be held liable for costs of defense and settlement/judgment up to policy limits, and may also be held liable for punitive damages for bad faith denial of claims. See *Frankenmuth Mutual Ins. Co. v. Williams by Stevens,* 645 N.E.2d 605, 608 (Ind.1995) (when insurer erroneously declines to defend and fails to seek declaratory judgment, insurer will be bound by the results of the underlying lawsuit); *Erie Ins. Co. v. Hickman,* 622 N.E.2d 515, 518 (Ind.1993) ("an insurer which denies liability knowing that there is no rational, principled basis for doing so has breached its duty" to deal with the insured in good faith); *Employers Ins. of Wausau v. Recticel Foam Corp.,* 716 N.E.2d 1015, 1027 (Ind.App.1999) (stating that when an insurer has a duty to defend an insured, the insurer is liable for the reasonable and necessary expenses incurred by the insured in defending the actions).

■ The third and fourth options offer a middle ground. The insurer can file a declaratory judgment action for a judicial determination of its obligations under the policy, or it can defend its insured under a reservation of 'rights. See *State Farm Fire & Cas. Co. v. T.B.,* 762 N.E.2d 1227, 1231 (Ind.2002); *Hoosier Ins. Co. v. Au-*

*diology Foundation of America,* 745 N.E.2d 300, 310 (Ind.App.2001); *Gallant Ins. Co. v. Wilkerson,* 720 N.E.2d 1223, 1227 (Ind.App.1999); *State Farm Mutual Automobile Ins. Co. v. Glasgow,* 478 N.E.2d 918, 923 (Ind.App.1985). Either of these two actions will preserve an insurer's right to challenge later the extent of coverage without being estopped by a judgment in the underlying action. *State Farm v. T.B.,* 762 N.E.2d at 1231; *Liberty Mutual Ins. Co. v. Metzler,* 586 N.E.2d 897, 901–02 (Ind.App.1992).

· If the insurer follows either of these latter two options, the insurer and its insured go forward together to defend the underlying litigation, but with at least a simmering potential conflict in their interests. The problem arises because liability insurance policies typically give the insurer control over the defense of the underlying litigation. In cases where the handling of the underlying litigation may affect whether the claim is covered or not covered, the conflict of interests may be sufficiently clear and immediate that one attorney cannot represent the interests of both the insurer and the insured. 

The classic example in Indiana law is a lawsuit by a person who has been shot and injured by the insured. The victim alleges in Count One that the insured shot him intentionally and in the alternative in Count Two that the insured shot him neg-

ligently. Under a typical liability insurance policy, coverage is available for negligent acts but not for intentional acts. The insurer therefore would benefit from either a defense verdict or a finding of intentional wrongdoing. The insured, on the other hand, would benefit from either a defense verdict or a finding of negligence. Absent informed consent of both the insurer and the insured, an attorney trying to represent both the insured and the insurer would face an insurmountable conflict of interest. See *Snodgrass v. ·Baize,* 405 N.E.2d 48, 51 (Ind.App.1980) (explaining that in such a case, insurer should not defend but should reimburse the insured's personal counsel), citing . *All–Star Ins. Corp. v. Steel Bar, Inc.,* 324 F.Supp. 160, 165 (N.D.Ind.1971) (in such cases the insurer "must either provide an independent attorney to represent the insured, or pay for the cost of defense incurred by the insured hiring an attorney of his choice"); accord, *Fireman's Fund Ins. Co. v. Waste Management of Wisconsin, Inc.,* 777 F.2d 366, 368–69 (7th Cir.1985) (applying Wisconsin law, reservation of rights created a conflict of interest where plaintiffs charged Waste Management with contaminating groundwater through negligent or intentional acts, and that the equitable solution was to allow insured to select counsel "subject to the approval and at the expense of" the insurer).[5]

5. Courts in other jurisdictions have similarly held that the insurer should pay for counsel selected by the insured in circumstances where the underlying lawsuit against the insured alleges both covered and non-covered conduct. See, *e.g., U.S. Fidelity & Guaranty Co. v. Louis A. Roser Co., Inc.,* 585 F.2d 932, 938 (8th Cir.1978) (finding reservation of rights created conflict of interest where plaintiff relied on three separate grounds for relief, two covered by the policy and one not covered; insurer had to reimburse insured for fees of counsel hired by insured in response to insurer's suggestion that insured retain its own counsel for allegations potentially not

covered by policy); *Nowacki v. Federated Realty Group, Inc.,* 36 F.Supp.2d 1099, 1104, 1107–08 (E.D.Wis.1999) (finding reservation of rights created conflict of interest where plaintiffs' complaint could be characterized as a mixture of intentional and negligent acts; insurer had to pay for counsel selected by insured, and insurer's consent on choice of counsel was not required by law); *Northland Ins. Co. v. Heck's Service Co., Inc.,* 620 F.Supp. 107, 108 (E.D.Ark.1985) (finding conflict of interest where it would be to insurer's benefit to defend case on bailment theory and to insured's benefit to defend case on negligence theory, and holding that insured "must

At the same time, not every reservation of rights poses a conflict for defense counsel. If the coverage dispute turns on issues that are independent of the issues in the underlying lawsuit, one lawyer selected by the insurer can handle the underlying litigation, and the insured and insurer can resolve the coverage dispute separately. *E.g., Blanchard v. State Farm Fire & Cas. Co.,* 2 Cal.App.4th 345, 2 Cal.Rptr.2d 884, 887 (1991); *Foremost Ins. Co. v. Wilks,* 206 Cal.App.3d 251, 253 Cal.Rptr. 596, 602 (1988); *Shelter Mutual Ins. Co. v. Bailey,* 160 Ill.App.3d 146, 112 Ill.Dec. 76, 513 N.E.2d 490, 496 (1987).

■ How should courts, insurers, and policyholders distinguish between reservations of rights that create conflicts requiring informed consent by the insured and those that do not? The problem is governed at its core by the Rules of Professional Conduct that address conflicts of interest where an attorney has multiple clients or where a third party is paying the attorney to represent a client (such as the

insured). The policy language in this case provides no guidance. Although it says that Erie will select defense counsel, the policy provision does not address reservations of rights or conflicts of interest. Even if the policy did address those issues, the policy could not authorize Erie to select and employ an attorney who would face a conflict of interest that would put her in violation of the Rules of Professional Conduct.[6]

The governing Rule of Professional Conduct is Rule 1.7(a). As amended effective January 1, 2005, the rule provides that unless the client gives informed consent, a lawyer shall not represent a client if the representation involves a "concurrent conflict of interest." A concurrent conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Ind. R. Prof. Cond. 1.7(a)(2).[7]

be allowed to select its own legal counsel for defense of the [underlying] suit," citing *Roser,* 585 F.2d 932); *Southern Maryland Agricultural Ass'n, Inc. v. Bituminous Cas. Corp.,* 539 F.Supp. 1295, 1304–06 (D.Md.1982) (finding conflict of interest where only one of three claims against insureds was even arguably within policy coverage; holding that insureds had right to choose their own attorney and insurer had to assume the reasonable costs of the defense provided); *CHI of Alaska, Inc. v. Employers Reinsurance Corp.,* 844 P.2d 1113, 1116–19, 1121 (Alaska 1993) (finding reservation of rights created conflict of interest where plaintiffs' complaint alleged negligent and intentional acts; insurer had to pay for counsel selected by insured, and insured had unilateral right to select counsel subject to implied covenant of good faith and fair dealing).

Cases addressing these issue often refer to counsel selected by the insured as *"Cumis* counsel," which stems from *San Diego Navy Federal Credit Union v. Cumis Ins. Society, Inc.,* 162 Cal.App.3d 358, 208 Cal.Rptr. 494

(1984) (affirming judgment requiring insurer to pay for counsel selected by insured after insurer reserved rights to deny coverage). The holding of *Cumis* has been superseded in California by a statute, Cal. Civil Code § 2860, which spells out more specific standards.

6. Under Indiana law, the interpretation of an insurance policy presents a question of law to be decided by the court. *Tate v. Secura Ins.,* 587 N.E.2d 665, 668 (Ind.1992).

7. The Indiana Supreme Court amended Rule 1.7 on September 30, 2004, effective January 1, 2005. The prior version of the Rule (in effect at the time the parties filed their briefs and made decisions in this case) provided that a lawyer "shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests," unless the client gave informed consent. Ind. R. Prof. Cond. 1.7(b) (2004).

Under this standard, attorneys, parties, and courts cannot resort to easy rules of thumb. See *Cincinnati Ins. Co. v. Wills*, 717 N.E.2d 151, 161 (Ind.1999) (refusing to adopt a broad prohibition on insurer's in-house counsel from representing policyholders; any abuses of rules of professional conduct can be handled on a case by case basis); *Dolatowski v. Estate of Rondinelli*, 692 N.E.2d 915, 919 (Ind.App.1998) (explaining that the question of whether an impermissible conflict of interest exists under Rule 1.7 "often is one of proximity and degree"); see also Comment 8 to Rule 1.7, as amended Sept. 30, 2004 ("The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client."). "There is no talismanic rule that allows a facile determination of whether a disqualifying conflict of interests exists. Instead, '[t]he potential for conflict requires a careful analysis of the parties' respective interests to determine whether they can be reconciled ... or whether an actual conflict of interest precludes insurer-appointed defense counsel from presenting a quality defense for the insured.'" *Gulf Ins. Co. v. Berger, Kahn, Shafton, Moss, Figler, Simon, & Gladstone*, 79 Cal. App.4th 114, 93 Cal.Rptr.2d 534, 545–46 (2000), quoting *Dynamic Concepts, Inc. v. Truck Ins. Exchange*, 61 Cal.App.4th 999, 71 Cal.Rptr.2d 882, 888 (1998).

Whether the potential conflict of interest is sufficient to require the insured's consent is a question of degree that requires some predictions about the course of the representation. If there is a reasonable possibility that the manner in which the insured is defended could affect the outcome of the insurer's coverage dispute, then the conflict may be sufficient to require the insurer to pay for counsel of the insured's choice. Evaluating that risk requires close attention to the details of the underlying litigation. The court must then make a reasonable judgment about whether there is a significant risk that the attorney selected by the insurance company will have the representation of the insureds significantly impaired by the attorney's relationship with the insurer.

Erie argues here that the rule is simple: If the underlying lawsuit alternatively alleges covered and non-covered conduct by the insured (such as the intentional v. negligent shooting cases), then the conflict requires independent counsel. If the underlying lawsuit does not alternatively allege both covered and non-covered conduct on the part of the insured, then the insurer's reservation of rights does not create a conflict entitling the insured to select his own attorney. Erie Br. 27 at 4–5 (summarizing argument). This simple test, however, loses sight of the broader principle, which Erie itself has correctly identified: "The conflict of interest arises because the manner in which the defense of the insured is conducted could be outcome determinative of the insurer's coverage defense, and to the Policy's duty to indemnify." *Id.* at 4. That standard comes closer to the applicable standard from Rule 1.7(a)(2), a significant risk that the representation will be materially limited by the attorney's responsibilities to a third person such as the insurer. The shooting example, with its either-or choice between intentional and negligent conduct, poses a clear and easy application of that standard. The standard, however, cannot be confined to only its easiest and clearest applications. Rule 1.7(a)(2) sweeps more broadly and looks more generally at the risk that an attorney's representation of one client will be impaired by her relationship with another client or another entity paying the bill. The court therefore examines the undisputed facts concerning the coverage issues Erie has raised and their relation-

ship to the likely course of the underlying litigation against the Armstrongs.

### B. *Erie's Reservation of Rights and the Policy Exclusions*

Erie reserved the right to deny coverage with respect to the Tillotson Location if the alleged environmental contamination (1) was "expected or intended," (2) did not involve a covered "occurrence," or (3) was "pollution" under the policy's pollution exclusion clause. Erie also issued a blanket reservation of rights based on any other coverage defense that might become apparent during Erie's investigation.

The blanket reservation and the pollution exclusion do not pose a conflict of interest that would entitle the Armstrongs to select their own counsel. The blanket reservation has no effect here. If the insurer later discovered some facts that defeated coverage (such as fraud by the insured), the insurer would always be able to assert that coverage defense (absent lack of diligence or some other unusual situation). The mere possibility that something else might turn up to defeat coverage cannot pose a "significant risk" that the defense attorney's representation of the insured would be impaired by her responsibilities to the insurer. See, *e.g.*, *County of San Bernardino v. Pacific Indemnity Co.*, 56 Cal.App.4th 666, 65 Cal. Rptr.2d 657, 673 &. n. 24 (1997) (blanket reservation of rights did not create conflict requiring independent counsel for insured).[8]

Similarly, in the circumstances of this case, Erie's reliance on the pollution exclusion does not pose a significant risk of impairing the defense attorney's representation of the Armstrongs. There are two reasons. First, under controlling Indiana law, as Erie acknowledged in its reservation of rights letter and concedes now, the pollution exclusion is not enforceable. See *American States Ins. Co. v. Kiger*, 662 N.E.2d 945 (Ind.1996),[9] Erie included that

---

**8.** Some authorities have stated that notice to an insured of a reservation of rights is insufficient unless it makes specific reference to the policy defense being relied upon by the insurer. *North River Ins. Co. v. Huff*, 628 F.Supp. 1129, 1134 (D.Kan.1985), citing 7C Appleman, *Insurance Law and Practice* § 4694, at 353. "An insurer may not reserve its rights to assert otherwise unidentified defenses with a general statement to the effect that such defenses may arise during the course of its investigation of the claim. Consequently, if the insurer fails to set forth specific defenses in its reservation of rights letter, it may be held to have waived those defenses or be estopped from asserting them at a later stage." James M. Davis and Paul Walker–Bright, *Insurers' Use of Boilerplate Affirmative Defenses and Rule 11—Where's the Outrage*, 15 Coverage 1, American Bar Association Section of Litigation (Jan./Feb.2005). However, a blanket reservation of rights may not do any harm, particularly if coupled with a claim of lack of information and issued in conjunction with one or more specific policy defenses. "[I]f an insurer does not have full knowledge of the facts upon which a particular coverage defense would depend, it normally does not waive that defense by failing to include it in a reservation of rights letter." *Id.;* see also *Northwestern Nat'l Ins. Co. v. Corley*, 503 F.2d 224, 232 (7th Cir.1974) (insurer's notice that it was proceeding under a "full reservation of all our rights under the policy" was a valid reservation when insurer lacked specific facts of possible defenses to coverage).

**9.** See also *Governmental Interinsurance Exchange v. City of Angola, Ind.*, 8 F.Supp.2d 1120, 1128 (N.D.Ind.1998) (following *Kiger*, finding that pollution exclusion clause did not exclude coverage for contamination from underground gasoline storage tank); *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 41–42 (Ind. 2002) (summarily affirming decision that pollution exclusion was to be construed against the insurer so as not to exclude coverage for injuries to occupants of office building resulting from release of toxic fumes from substances used to install carpet); *Seymour Mfg. Co. v. Commercial Union Ins. Co.*, 665 N.E.2d 891, 892 (Ind.1996) (relying on *Kiger*, finding that insurance company had duty to defend waste-handling facility against suit over alleged contamination by leaking of the wastes);

reservation of rights only as a precaution to protect its rights in the event that Indiana law on the issue might change. Second, even if the law were to change so that the exclusion became enforceable, it is unlikely that the defense of the underlying lawsuit would affect the success of the coverage defense. If the alleged contamination of the groundwater was caused by chemicals released by the Armstrongs' business, the pollution exclusion would appear to apply, at least if it were enforceable. In other words, the existence of the issue does not pose a significant risk that defense counsel's representation of the Armstrongs would be impaired by counsel's relationship with the insurer.

The central dispute here concerns Erie's reservation of rights based on the policy exclusion for "expected and intended" harms and the definition of "occurrences," which present essentially the same problem.

■ The Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to the same general, harmful conditions." Indiana courts faced with "occurrence" exclusions essentially identical to the one in the Policy have defined an "accident" as "an unexpected happening without an intention or design." *Auto–Owners Ins. Co. v. Harvey*, 813 N.E.2d 1190, 1193 (Ind.App.2004); accord, *Amerisure, Inc. v. Wurster Construction Co.*, 818 N.E.2d 998, 1004 (Ind.App.2004). Whether the alleged contamination constituted an "occurrence," and thus is covered under the Policy, depends on whether the Armstrongs expected or intended the contamination.

■■ In the "expected or intended" exclusion, the terms "expected" and "intended" have different meanings. Intentional injury in the exclusion clause "contemplates the volitional performance of an act with an intent to cause injury, although not necessarily the precise injury or severity of damage that in fact occurs." *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 728 (Ind.App.2004), quoting *Sans v. Monticello Ins. Co.*, 676 N.E.2d 1099, 1102 (Ind. App.1997). Expected injury means "injury that occurred when the insured acted even though he was consciously aware that harm was practically certain to occur from his actions.... Consciousness of the likelihood of certain results occurring is determined by examination of the subjective mental state of the insured." *Id;* accord, *State Farm Fire & Cas. Co. v. Miles*, 730 F.Supp. 1462, 1466 (S.D.Ind.1990) (adopting definition of intended injury from *Home Ins. Co. v. Neilsen*, 165 Ind.App. 445, 332 N.E.2d 240 (1975)), *aff'd*, 930 F.2d 25 (7th Cir.1991); *Indiana Farmers Mutual Ins. Co. v. Ellison*, 679 N.E.2d 1378, 1382–83 (Ind.App.1997) (applying "practically certain" standard to reverse trial court finding that insured, who exposed a child to a child molester, did not expect the injuries that the child suffered). Negligent conduct and even reckless conduct are not enough to meet the "practically certain" standard. *PSI Energy*, 801 N.E.2d at 728. Also, the "intended injuries" standard is generally more difficult to meet than the "expected injuries" standard. *Id.*

### C. *Underlying Environmental Claims*

To evaluate the risk that an attorney's obligations to Erie could materially limit

---

*Travelers Indemnity Co. v. Summit Corp. of America*, 715 N.E.2d 926, 934–35 (Ind.App. 1999) (construing pollution exclusion against insurer so as not to exclude coverage for environmental claims against insured, whose principal business was manufacturing and finishing metal parts). Both the *Kiger* and *Seymour* cases included pollution exclusions with a "sudden and accidental" exception. Erie's pollution exclusion, like the exclusion in *Summit*, does not have a "sudden and accidental" exception.

his representation of the Armstrongs, the court turns to State Farm's underlying environmental claims against the Armstrongs, keeping in mind Erie's reservation of rights.

State Farm brought its third party complaint against the Armstrongs and others pursuant to Indiana Code §§ 13–30–9–2, –3, and –5. SF, Ex. D, ¶¶ 33–35. Section 13–30–9–5 provides: "A defendant in an environmental legal action may assert defenses provided by law or equity, including a defense that damages suffered by the person who brought the environmental legal action were caused in whole or in part by a non-party." Section 13–30–9–2 provides:

> A person may bring an environmental legal action against a person who caused or contributed to the release of a hazardous substance or petroleum into the surface or subsurface soil or groundwater that poses a risk to human health and the environment to recover reasonable costs of a removal or remedial action involving the hazardous substances or petroleum.

To prove liability against the Armstrongs under § 13–30–9–2 and § 13–30–9–5, State Farm is not required to prove that the Armstrongs expected or intended any contamination, or even that they acted negligently. The statute requires a trier of fact to determine only whether the Armstrongs "caused or contributed to" the contamination at the Tillotson location, not to determine the Armstrongs' state of mind or level of culpability. Determination of only cause or contribution would not pose a conflict of interest for counsel because those issues will not control the issue of policy coverage. See *Illinois Tool Works, Inc. v. Home Indemnity Co.*, 998 F.Supp. 868, 873–74 (N.D.Ill.1998) (strict liability claim for pollution did not pose conflict of interest; court did not address whether

remedial issues among polluters would pose conflict of interest).

The analysis cannot stop, however, at the determination of liability. At the remedy stage of the proceeding, if the case goes that far, the Armstrongs' state of mind and degree of care are likely to be directly at issue. Allocation of costs among potentially responsible parties is a highly fact-intensive process, one that depends on the circumstances of each case. See *Environmental Transportation Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir.1992) (applying federal CERCLA, parallel to state statutes at issue here). Section 13–30–9–3 governs the allocation of costs of removal or remediation among potentially responsible parties. That section provides in relevant part:

> In resolving an environmental legal action, a court shall allocate the costs of the removal or remedial action in proportion to the acts or omissions of each party, without regard to any theory of joint and several liability, using legal and equitable factors that the court determines are appropriate, including the following:
>
> (1) The degree of care exercised by each party with respect to the release of the hazardous substance or petroleum caused or contributed to by each party.
>
> (2) The amount and characteristics of the hazardous substance or petroleum that was released.
>
> (3) The risks posed by the hazardous substance or petroleum based on the use of the site at the time the hazardous substance or petroleum was released into the environment and the cost effectiveness of the removal or remedial action to address the risks.
>
> (4) Whether a party's acts or omissions violated a federal, state, or

local statute, rule, regulation, or or-
dinance.

(5) The extent to which each party
exercised actual and direct manage-
rial control over the site where the
hazardous substance or petroleum
was released at the time of the re-
lease.

(6) Whether an award of reasonable
costs, including attorney's fees, to a
party involved in the environmental
legal action is appropriate.

(7) Other equitable factors, including
unjust enrichment, that the court
determines are appropriate.

Erie is correct that § 13–30–9–3 will not
*require* the trier of fact in the environmen-
tal action to make a finding about whether
the Armstrongs acted intentionally or neg-
ligently. Def. Br. 32 at 3. Neither the
term "expected" nor the term "intended"
appear anywhere in § 13–30–9–3. Howev-
er, the plaintiff, and especially the other
potentially responsible parties, in the un-
derlying environmental suit will have pow-
erful incentives to attempt to show that
the Armstrongs are liable for a high per-
centage of the costs pursuant to Ind.Code
§ 13–30–9–3. The other parties could try
to do so by proving that the Armstrongs
intentionally or illegally released hazard-
ous substances, or that they were con-
sciously aware that contamination was
practically certain to occur from their ac-
tions.

The factors under § 13–30–9–3 allow ev-
idence of the Armstrongs' state of mind,
expectations, or intentions in three ways.
The first equitable factor—the degree of

care exercised with respect to the release
of a hazardous substance—invites evidence
on whether the Armstrongs at least ex-
pected the contamination. Evidence that
they were consciously aware that harm
was practically certain to occur from their
actions would be highly relevant under
that factor.

The fourth equitable factor—whether a
party's acts or omissions violated a federal,
state, or local statute, rule, regulation, or
ordinance—also invites evidence of the
Armstrongs' expectations or intent. Even
if § 13–30–9–2 itself requires proof only of
causation and not fault, other statutes may
result in aggravated sanctions for pollution
violations, up to and including criminal
penalties for deliberate, intentional, or
knowing conduct. *E.g.*, 33 U.S.C.
§ 1319(c)(2) (providing criminal penalties
for knowing violations of the federal Clean
Water Act); Ind.Code § 13–30–6–1 (pro-
viding that a person who intentionally,
knowingly, or recklessly violates environ-
mental management laws or air and water
pollution laws commits a Class D felony).
Another potentially responsible party in-
tent on minimizing its own exposure for
remedial costs would have ample incentive
to investigate the Armstrongs in discovery
to try to prove that they acted intentional-
ly or knowingly as a way of minimizing its
own liability for costs.

Under the catch-all seventh factor in
§ 13–30–9–3, the court also could borrow
equitable factors often applied to
§ 113(f)(1) of the federal Comprehensive
Environmental Response, Compensation,
and Liability Act ("CERCLA"), 42 U.S.C.
§ 9613(f)(1), the federal counterpart to
§ 13–30–9–3.[10] Many courts applying

**10.** CERCLA § 113(f)(1) provides in part that "Any person may seek contribution from any other person who is liable or potentially liable under section 107(a) ... In resolving contri-bution claims, the court may allocate re-sponse costs among liable parties using such equitable factors as the court determines are appropriate." While CERCLA § 113(f)(1) pro-vides for allocation of response costs between PRPs, CERCLA § 107(a) imposes liability on parties irrespective of fault or their role in the release of a hazardous substance. *See Rump-ke of Indiana, Inc. v. Cummins Engine Co.*, 107 F.3d 1235, 1240 (7th Cir.1997). Ind. Code § 13–30–9–2 is analogous to CERCLA's § 107(a) cost-recovery provision. *Northstar*

§ 113(f)(1) to resolve contribution claims among PRPs have applied the following so-called "Gore Factors":

(1) the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous substance can be distinguished;

(2) the amount of the hazardous substance involved;

(3) the degree of toxicity of the substance involved;

(4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the substance;

(5) the degree of care exercised by the parties with respect to the substance involved, taking into account the characteristics of the substance;

(6) the degree of cooperation by the parties with federal, state, or local officials to prevent harm to the public health or the environment.

*ENSCO*, 969 F.2d at 508–09 (affirming district court's allocation to appellant transport company the entire cost of cleaning up hazardous spill resulting from highway accident; discussing Gore factors but concluding that the relative fault of the parties was the decisive factor for allocating costs in that case); accord, *United States v. Consolidated Coal Co.*, 345 F.3d 409, 413–14 (6th Cir.2003); *United States v. Colorado & Eastern Railroad Co.*, 50 F.3d 1530,

1536 n. 5 (10th Cir.1995).[11] The list of "Gore Factors" is neither exhaustive nor exclusive. *ENSCO*, 969 F.2d at 509. Other equitable factors considered by courts applying § 113(f)(1) include the parties' knowledge and awareness of the contamination, the parties' knowledge and/or acquiescence in the contaminating activities, and the parties' efforts to prevent environmental harm. *Id.; United States v. Davis*, 31 F.Supp.2d 45, 63 (D.R.I.1998), *aff'd*, 261 F.3d 1 (1st Cir.2001).

In arguing for allocation based on these equitable factors, State Farm and other parties would have a strong incentive to seek and present evidence that the Armstrongs at least expected that their activities would cause or contribute to the Tillotson location contamination; *i.e.*, evidence of the Armstrongs' knowledge and awareness of contamination. Case law supports this view. For example, *Gould Inc. v. A & M Battery & Tire Service*, 987 F.Supp. 353, 363–64, 370–72 (M.D.Pa.1997), presented a case of allocation of liability under a strict liability federal statute (CERCLA). The liable parties presented evidence of their own and the others' degrees of knowledge and care in an attempt to persuade the court to allocate more liability to the opponents.[12] See also *United States v. Consolidation Coal Co.*, 345 F.3d 409 (6th Cir.2003) (affirming district court's allocation of response costs under CERCLA based in part on parties' knowledge or lack

---

Partners v. S & S Consultants, Inc.*, 2004 WL 963706, *7, 2004 U.S. Dist. Lexis 7799, *22–23 (S.D.Ind. March 31, 2004), citing *Taylor Farm Limited Liability Co. v. Viacom, Inc.*, 234 F.Supp.2d 950 (S.D.Ind.2002); *Commercial Logistics Corp. v. ACF Industries, Inc.*, 2004 WL 2595880, *3–4, 2004 U.S. Dist. Lexis 23140, *11–14 (S.D.Ind. Nov. 10, 2004).

**11.** The "Gore Factors" were originally proposed by Representative Al Gore in 1980 as an approach to joint and several liability, to apportion contribution claims under § 113(f)(1), but were never enacted into law.

**12.** The Third Circuit vacated the *Gould* decision in light of post-judgment legislation. The appellate decision does not affect the relevance of the evidence about knowledge and degree of care, nor the illustration of how potentially responsible parties have an incentive to shift blame to one another on the basis of such evidence. See *Gould Inc. v. A & M Battery & Tire Service*, 232 F.3d 162 (3d Cir. 2000).

of knowledge that wastes contained hazardous substances); *United States v. Davis*, 31 F.Supp.2d at 65 (allocating costs under CERCLA based in part on level of culpability; finding that generators of hazardous substances were relatively culpable because they knew that wastes they produced contained hazardous substances, and owner of waste site was on notice that noxious chemicals were percolating into groundwater and migrating into nearby stream even though he did not know exact composition of wastes).

Cases resolving coverage disputes over pollution claims also show that such evidence about the polluters' knowledge and degree of care is often highly relevant to the insurance coverage issue. See, *e.g.*, *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 730–31 (Ind.App.2004) (in relevant part affirming denial of summary judgment on exclusion for "expected or intended" harm where insured and insurer submitted opposing evidence on insured's knowledge regarding pollution from industrial operation); *CPC Int'l, Inc. v. Northbrook Excess and Surplus Ins. Co.*, 144 F.3d 35, 43 (1st Cir.1998) (affirming verdict for insured on third appeal in the case); *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co.*, 817 F.Supp. 1136, 1150 (D.N.J.1993) (admitting evidence of plaintiff insured's problems at other tank cleaning sites on issue of insured's knowledge); *Hatco Corp. v. W.R. Grace & Co.*, 801 F.Supp. 1334, 1376 (D.N.J.1992) (insured submitted evidence on state-of-knowledge to oppose insurer's contention that insured intended and expected to cause contamination at site), *vacated on other grounds*, 59 F.3d 400 (3d Cir.1995); *New Castle County v. Continental Cas. Co.*, 725 F.Supp. 800, 803–04 (D.Del.1989) (insured submitted evidence on state-of-the-art knowledge about leachate from landfills on issue of whether pollution was expected).

In sum, although liability under Indiana Code § 13–3–9–2 does not require proof of fault, issues of the Armstrongs' knowledge, intent, and degree of care will all be relevant in allocating liability for remedial costs among responsible parties if liability is found. The first, fourth, and seventh equitable factors in § 13–30–9–3 all invite evidence on those subjects, which are central to Erie's reservation of rights on the "expected and intended" exclusion and the definition of a covered "occurrence." The issues on which coverage turns are not independent of the issues relevant in the underlying litigation, at least with respect to allocation of remedial costs pursuant to § 13–30–9–3.

### D. "Significant Risk" of "Material Limitation"

■ The question under Rule of Professional Conduct 1.7(a)(2) is whether there is a "significant risk" that an attorney selected by the insurer and subject to its direction would be "materially limited" in representing the Armstrongs by a relationship with the insurer under these circumstances. The parties have not cited and the court has not found Indiana case law directly addressing that question.

Case law from other jurisdictions is instructive. In *CHI of Alaska, Inc. v. Employers Reinsurance Corp.*, for example, the Alaska Supreme Court listed three sources of a conflict of interest between an insurer and insured in cases where an insurer asserts either policy or coverage defenses and defends its insured under a reservation of rights: (1) the insurer may steer the defense so as to make the likelihood of a plaintiff's verdict greater under an uninsured theory; (2) the insurer may offer a less than vigorous defense if the insurer knows that it can later assert noncoverage, or if it thinks that the loss it is defending will not be covered under the

policy; and (3) the insurer might gain access to confidential or privileged information, which it might later use to its advantage in litigation concerning coverage. 844 P.2d 1113, 1116, 1118 (Alaska 1993); see also *Nandorf, Inc. v. CNA Ins. Cos.*, 134 Ill.App.3d 134, 88 Ill.Dec. 968, 479 N.E.2d 988, 992 n. 5 (1985) (concluding that a conflict of interest would arise where an insurer lacks incentive to defend its insured on a portion of the claims that appear not to be covered by the policy and has "an interest in providing a less than vigorous defense").

Perhaps most relevant is the Eighth Circuit's statement in *U.S. Fidelity & Guaranty Co. v. Louis A. Roser Co.*, 585 F.2d 932 (8th Cir.1978), where the court found that an actual conflict required the insurer to pay for independent counsel for the insured. The insurer had selected counsel to defend its insured in a case with three theories of liability, two that were covered and one that was not. The court acknowledged that an attorney retained by an insurance company is required and expected to act conscientiously and to render effective service. 585 F.2d at 938 n. 5. But the court continued:

> However, we cannot escape the conclusion that it is impossible for one attorney to adequately and fairly represent two parties in litigation in the face of the real conflict of interest which existed here. Even the most optimistic view of human nature requires us to realize that an attorney employed by an insurance company will slant his efforts, perhaps unconsciously, in the interests of his real client—the one who is paying his fee and from whom he hopes to receive future business—the insurance company.

*Id.* at 938 n. 5 (continuing to quote Matthew 6:24: "No man can serve two masters . . . .").

The conflict in this case is not as immediate or stark or certain as the conflict in the intentional v. negligent shooting cases, such as *Snodgrass* or *All–Star Insurance, supra.* Under the terms of Indiana Code § 13–30–9–2, any person or business who contributed to the harm can be found liable for it, regardless of fault or intent.

The critical issue, assuming liability is found, will be allocation of the costs of a remedy among all the potentially responsible parties. As long as the private party or government agency seeking a remedy can show causation for harm, the allocation issue is likely to be the most important issue facing the Armstrongs. That allocation decision makes relevant the same evidence that would be relevant to Erie's principal defenses to coverage. It is not certain that the issues will arise or that counsel will face an intolerable conflict, but certainty is not the standard. The standard under Rule 1.7 is a "significant risk" of a "material limitation" on the attorney's ability to represent the insureds.

The court is confident there is a "significant risk" of such a conflict here. In preparing the State Farm case for trial, attorneys for the Armstrongs must investigate the facts and conduct discovery to learn as much as they can about how and why the groundwater came to be so contaminated that state authorities have demanded that it be cleaned up. In preparing for trial, the Armstrongs' attorneys will need to be ready for a remedial portion of the case. They and the Armstrongs cannot afford to assume that they will win on the causation issues. The Armstrongs' attorneys will need to go back through years of records and will need to interview former employees and other witnesses. Also, the Armstrongs' attorneys will need to keep Erie advised of the progress of the case and about how the facts they learn may affect settlement or other strategic and tactical decisions.

Such information could easily work to the detriment of the Armstrongs in the

coverage dispute with Erie. In preparing for trial on remedial issues, the applicable law makes directly relevant the same facts and circumstances that are likely to be most relevant in deciding Erie's coverage defenses based on the definition of occurrence and on the exclusion for intended or expected injuries—the degree of care exercised by the Armstrongs and their state of mind toward possible environmental harm. Also, of course, one must keep in mind that Erie apparently felt it had sufficient information about the situation at the Tillotson location to reserve its rights based on the "expected or intended" exclusion and the definition of an occurrence. The prominence of those same factual and legal issues in the remedial portion of the underlying litigation, together with the specific terms of Erie's reservation of rights, means that the undisputed facts show a significant risk that attorneys selected by the insurer would be materially limited in their representation of the Armstrongs.

Erie points out that the Armstrongs have not criticized the performance of attorney Trimble and have not attempted to show they have been prejudiced by Erie's selection of him to defend them in the State Farm action. The argument misses the point in three ways. First, the Rules of Professional Conduct apply to all lawyers, including those of great skill and integrity. The conflict of interest rules, in particular, apply regardless of the individual lawyers' skill or integrity or the reputation of their law firms. Second, a client who is being represented by an attorney who faces a conflict of interest is not required to wait until she can show harm or prejudice before obtaining relief from the conflict. Third, in any event, as briefing was being concluded on the motions for summary judgment, Mr. Trimble and his law firm withdrew their appearances for the Armstrongs and a new lawyer and law firm replaced them in the State Farm action.

Erie also argues that the Armstrongs are arguing in favor of a novel *per se* rule for independent counsel for an insured in any pollution case in which the insurer defends under a reservation of rights. The court does not understand the Armstrongs to be seeking such a result, nor does the court believe that this ruling adopts such a *per se* rule. Rule 1.7(a)(2) does not impose a *per se* rule. It instead requires a close look at the nature of the conflicting interests, the issues in the underlying litigation, and the risk that the attorney's relationship with the insurer will materially limit his representation of the insured. That evaluation of risk must be done in advance, before the court or the parties can know for certain the course of the underlying litigation. But the fact-intensive and case-specific nature of the inquiry does not establish a *per se* rule. See generally *Fireman's Fund Ins. Co. v. Waste Management of Wisconsin,* 777 F.2d at 369 (under Wisconsin law, "particularly under the circumstances of this case," insurer could not reserve rights and reserve exclusive right to select defense counsel).[13]

---

**13.** In a case under Illinois law, the Seventh Circuit took a narrower view of conflicts of interest that entitle the insured to select her own counsel. In *Maneikis v. St. Paul Ins. Co. Of Illinois,* 655 F.2d 818, 825 (7th Cir.1981), the Seventh Circuit interpreted Illinois cases as requiring that the insured and insurer be "complete adversaries on a crucial issue which would necessarily be decided either one way or the other if liability was imposed."

This is the narrower standard that Erie advocates in this case. In *Littlefield v. McGuffey,* 979 F.2d 101, 105–06 (7th Cir.1992), the court discussed *Maneikis* but noted that a later Illinois decision had disagreed with the Seventh Circuit's earlier prediction of Illinois law. In *Nandorf, Inc. v. CNA Ins. Cos.,* 134 Ill.App.3d 134, 88 Ill.Dec. 968, 479 N.E.2d 988, 992 (1985), the Illinois court discerned

Erie also contends there is no significant conflict of interest here because of the "Chinese Wall" procedures it has implemented by dividing its file between one claims adjuster to work on the defense of the State Farm action and another claims adjuster to work on the coverage issue. The argument is not persuasive here. The procedures are limited to the front-line adjusters. There is no indication that they apply to more senior supervisors of both adjusters, including those who would have to approve payment of the attorney fees and any settlement. In addition, the adjuster handling the defense issues has a copy of the reservation of rights letter and must be presumed to understand the coverage issues.

In its reply brief, Erie asked two rhetorical questions that deserve answers. The first: "where within Ind.Code § 13–30–9–3(a) is there any mention of the allocation being based on whether a party's conduct was intentional?" The second: "at what level of allocation to the Armstrongs could one conclude that the Armstrongs engaged in intentional misconduct? Would a 25% allocation of costs to the Armstrongs confirm intentional misconduct? How about a 50% allocation? 75%? 99%? 100%?" Erie Reply Br. 32 at 4. In answer to the first question, the statute of course does not use that specific language. But as explained above, the first, fourth, and seventh factors all make state of mind relevant. The answer to the second question is that the numerical allocation by itself would not be meaningful, but courts must make findings of fact and must explain their decisions about allocation of damages. See, e.g., *Gould Inc. v. A & M Battery & Tire Service*, 987 F.Supp. at

363–64, 370–72 (allocating responsibility based in part on awareness of harm and culpability). There is a substantial likelihood that those explanations in the underlying State Farm case will address issues such as knowledge and intent, keeping in mind that some of the relevant statutes are criminal statutes requiring proof of deliberate or knowing actions.

For all these reasons, the court denies Erie's motion for summary judgment and grants the Armstrongs' motion on the issue of whether they must be allowed to select their own counsel paid for by Erie. The undisputed facts here are sufficient to show a significant risk that an attorney selected by and under the control of Erie would be materially limited in the representation of the Armstrongs as a result of the relationship with Erie and its reservation of rights.

## II. *Bad Faith Claim*

The Armstrongs also seek compensatory and punitive damages for what they claim has been Erie's bad faith in handling their demand for coverage and defense. According to the Armstrongs, Erie's bad faith is shown by its failure to pay the fees and costs they incurred prior to Erie's appointment of counsel in their case; by its failure to pay the fees and costs they incurred after Erie's appointment of counsel; and by its agreement to defend them without a reservation of rights as to the Janney Avenue location but not as to the Tillotson location.

Erie has moved for summary judgment on the claim. The Armstrongs argue that there exist genuine issues of

the broader principle in the cases and found that an insured would be entitled to select counsel whenever the insurer lacks incentive to defend its insured on a portion of claims that appear not to be covered by the policy. In any event, this case is governed by Indiana

law. Rule 1.7(a)(2) of the Indiana Rules of Professional Conduct provides the applicable "significant risk" standard, which is considerably broader than the standard articulated in *Maneikis*.

material fact that prevent the court from granting summary judgment to Erie. The Armstrongs also request additional time pursuant to Fed.R.Civ.P. 56(f) to conduct discovery prior to a ruling on Erie's motion for summary judgment on these claims. The court denies the Armstrongs' requests and grants summary judgment to Erie on the bad faith claim. The undisputed facts show that Erie had a reasonable basis for denying the Armstrongs' request for independent counsel.

Indiana law recognizes a legal duty, implied in all insurance contracts, for the insurer to deal in good faith with its insured. *Erie Ins. Co. v. Hickman,* 622 N.E.2d 515, 518 (Ind.1993). The insurer's obligation of good faith and fair dealing includes an obligation to refrain from causing an unfounded delay in making payment; making an unfounded refusal to pay policy proceeds; exercising an unfair advantage to pressure an insured into settlement of his claim; and deceiving the insured. *Id.* at 519; *Hoosier Ins. Co. v. Audiology Foundation of America,* 745 N.E.2d 300, 310 (Ind.App.2001). The reasoning of *Hickman* easily applies to an insurer's decisions about whether to allow an insured to select her own counsel when there is a conflict of interest resulting from a reservation of rights.

Indiana courts have taken care, however, to limit the tort to instances of true bad faith, as distinct from honest errors. "Poor judgment or negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present." *Woodley v. Fields,* 819 N.E.2d 123, 133 (Ind.App.2004), quoting *Colley v. Indiana Farmers Mutual Ins. Group,* 691 N.E.2d 1259, 1261 (Ind.App. 1998). "A finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Id.* Similarly, punitive damages may be awarded "only if there is

clear and convincing evidence that the defendant 'acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.' " *Erie Ins. Co. v. Hickman,* 622 N.E.2d at 520, quoting *Bud Wolf Chevrolet, Inc. v. Robertson,* 519 N.E.2d 135, 137–38 (Ind. 1988).

Although the court has disagreed with Erie on the merits of its refusal to authorize and pay for independent counsel for the Armstrongs, the discussion of that issue shows that there is little controlling case authority under Indiana law. The governing standard does not draw bright and clear lines between acceptable potential conflicts of interests and unacceptable concurrent conflicts of interest. These facts are not disputed, and they show that Erie had "a reasonable legal basis" for its decision, even though the court has disagreed with that decision. See *Thompson Hardwoods, Inc. v. Transp. Ins. Co.,* 2002 WL 440222, *12 (S.D.Ind. March 15, 2002) (granting summary judgment for insurer on bad faith claim, though merits of coverage dispute would require trial; law was uncertain as to when insured corporation would be responsible for arson allegedly committed by officer and shareholder).

The court is not persuaded by the Armstrongs' argument that Erie's bad faith is shown by its failure to pay the fees and costs they incurred prior to Erie's appointment of Trimble. The argument is simply not supported by the evidence. As Erie points out, the undisputed facts show that Trimble entered his appearance on behalf of the Armstrongs about two weeks before the earliest date for which their personal counsel, Michael Nelson, seeks payment for attorney fees. The Armstrongs notified Erie of the State Farm action against them on June 4, 2003. Trimble entered his notice of appearance with the court on

June 18, 2003. The earliest date for which Nelson has requested payment for legal services performed on behalf of the Armstrongs in connection with the State Farm action was July 1, 2003. SF, Ex. J. Although Erie did not formally tell the Armstrongs that it had hired Trimble to represent them until July 21, 2003, Nelson's law firm received immediate electronic notice of Trimble's appearance on June 18, 2003. See *Ivey v. State Farm Ins. Cos.*, No. 1:02–cv–1369–SEB–VSS, Docket No. 45 (June 18, 2003 notice of appearance with certificate of electronic service). In any event, it would have been reasonable to expect Nelson to check the court's docket for a notice of appearance before working on the State Farm action. Erie's refusal to pay for Nelson's early work is not evidence of bad faith.

▮ With respect to Erie's failure to pay the fees and costs the Armstrongs incurred after Erie hired Trimble, bad faith on the part of Erie would be indicated only if Erie's argument for denying the Armstrongs' request were unfounded and had no rational, principled basis. See *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind.2002) (to prove bad faith for denial of liability, "the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability"). This court's discussion and ruling above preclude such a finding. An insurance company has the right to a good faith dispute with its insured. *Erie*, 622 N.E.2d at 520. The evidence would not allow a reasonable jury to find that the dispute over whether Erie can choose counsel for the Armstrongs' defense has been anything but a good faith dispute over the meaning of Indiana law.

The Armstrongs also argue that Erie's decision to defend them under a reservation of rights at the Tillotson location but unconditionally at the Janney Avenue location, without explaining the reason, is evidence of deceit. Based on the undisputed evidence, a reasonable fact finder could not find that reserving rights for litigation concerning only one of the locations suggests bad faith as defined under Indiana law. There is no reason to assume that the underlying circumstances at the Janney Avenue location are identical to those at the Tillotson location. On this record, no reasonable trier of fact could conclude that this choice reflected "dishonest purpose, moral obliquity, furtive design, or ill will." See *Woodley v. Fields*, 819 N.E.2d at 133.

▮ Finally, the court denies the Armstrongs' request for more time to conduct discovery on the issues of bad faith and punitive damages. The Armstrongs have had ample opportunity to conduct discovery on their bad faith claim. See *United States v. Bob Stoffer Oldsmobile–Cadillac, Inc.*, 766 F.2d 1147, 1153 (7th Cir.1985) (affirming summary judgment after denial of more time to conduct discovery; "party who has been dilatory in discovery may not use Rule 56(f) to gain a continuance where he has made only vague assertions that further discovery would develop genuine issues of material fact"); accord, *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 885–87 (7th Cir.2005) (affirming summary judgment; district court did not abuse discretion by denying Rule 56(f) request where plaintiffs had sufficient time to conduct discovery needed to oppose summary judgment). There is no specific indication that discovery of the type described in the Armstrongs' brief would lead to a genuine dispute of material fact as to these issues.[14]

---

14. Even if Erie's choice not to involve the Armstrongs in its decision to change counsel from Lewis & Wagner to Wooden & McLaughlin could be considered poor judgment, no reasonable fact finder could conclude that this choice reflected conscious wrongdoing or ill will. See *Woodley v. Fields*, 819 N.E.2d at 133.

**820**

Accordingly, a reasonable fact finder could not conclude from the undisputed evidence that Erie has engaged in conduct that constitutes a bad faith breach of the insurance contract. The court grants Erie's motion for summary judgment on the bad faith and punitive damages claims.

### Conclusion

For the foregoing reasons, the court grants the Armstrongs' motion for summary judgment as to whether they are entitled to select their own counsel to defend them in the State Farm matter, and grants Erie's motion for summary judgment on the Armstrongs' claim for a bad faith breach of the insurance contract. The court will conduct a status conference on Tuesday, April 12, 2005 at 4:30 p.m. in Room 330, Birch Bayh U.S. Courthouse, Indianapolis, Indiana, to address whether any further proceedings are needed before entry of final judgment declaring that the Armstrongs are entitled to have counsel of their own choice (subject to reasonable approval by Erie, and compensated by Erie at reasonable fees and expenses), and dismissing the Armstrongs' bad faith claim with prejudice.

So ordered.