In re: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

This document relates to: City of Mishawaka v. Amerada Hess Corp., et al., 04 Civ. 2055

City of Rockport v. Amerada Hess Corp., et al., 04 Civ. 1724

City of South Bend v. Amerada Hess Corp., et al., 04 Civ. 2056

North Newton School Corp. v. Amerada Hess Corp., et al., 03 Civ. 2057

Town of Campbellsburg v. Amerada Hess Corp., et al., 04 Civ. 4990

Nos. 1:00–1898, M 21–88, MDL 1358(SAS).

United States District Court, S.D. New York.

Nov. 9, 2005.

Scott Summy, Carla Burke, Baron & Budd, P.C., Dallas, TX, for Plaintiffs.

Robin Greenwald, Robert Gordon, C. Sanders McNew, Weitz & Luxenberg, P.C., New York City, for Plaintiffs.

Michael A. Walsh, Courtney L. Jones, Jadd F. Masso, Strasburger & Price, LLP, Dallas, TX, for Defendant 7–Eleven, Inc.

Christopher J. Garvey, Goodwin Procter, LLP, New York City, for Defendant Gulf Oil Limited Partnership.

J. Stephen Bennett, Baker & Daniels, Fort Wayne, IN, for Defendant Lassus Bros. Oil, Inc.

Peter John Sacripanti, James A. Pardo, Stephen J. Riccardulli, McDermott, Will & Emery LLP, New York City, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

In this consolidated multi-district litigation, plaintiffs seek relief from defendants' alleged contamination, or threatened con-

tamination, of groundwater with the gasoline additive methyl tertiary butyl ether ("MTBE"). The parties have already engaged in extensive motion practice, and familiarity with the Court's previous opinions is assumed.[1] Gulf Oil Limited Partnership ("Gulf Oil LP"), Lassus Bros. Oil, Inc. ("Lassus Bros. Oil"), and 7–Eleven, Inc. ("7–Eleven") now move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for the complete dismissal of City of South Bend, Town of Campbellsburg, City of Mishawaka, City of Rockport, and North Newton School Corporation's ("Indiana plaintiffs") claims against them.

## II. BACKGROUND

### A. The Court's Prior Ruling

On April 20, 2005, I dismissed the claims of the Indiana plaintiffs against all downstream handlers, as defined by plaintiffs,[2] without prejudice because their Complaints were inherently contradictory.[3] Because of the possibility that this inherent contradiction resulted from a drafting error, I granted leave to replead and advised plaintiffs that if they amended their complaints, they should "clarify whether 'defendants' and 'downstream handlers' are mutually exclusive categories." [4]

**1.** *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 399 F.Supp.2d 340 (S.D.N.Y. 2005); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 399 F.Supp.2d 325 (S.D.N.Y.2005); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* No. M21–88, MDL 1358, 2005 WL 1529594 (S.D.N.Y. June 28, 2005); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* No. M21–88, MDL 1358, 2005 WL 1500893 (S.D.N.Y. June 24, 2005); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 402 F.Supp.2d 434 (S.D.N.Y.2005); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 399 F.Supp.2d 242 (S.D.N.Y.2005); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 233 F.R.D. 133 (S.D.N.Y.2005); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348 (S.D.N.Y.2005); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* No. M21–88, MDL 1358, 2005 WL 106936 (S.D.N.Y. Jan. 18, 2005); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* No. M21–88, MDL 1358, 2005 WL 39918 (S.D.N.Y. Jan. 6, 2005); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 364 F.Supp.2d 329 (S.D.N.Y.2004); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 361 F.Supp.2d 137 (S.D.N.Y.2004) (*"MTBE VI"*); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 341 F.Supp.2d 386 (S.D.N.Y.2004) (*"MTBE V"*); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 341 F.Supp.2d 351 (S.D.N.Y.2004) (*"MTBE IV"*); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 342 F.Supp.2d 147 (S.D.N.Y.2004) (*"MTBE III"*); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 209 F.R.D. 323 (S.D.N.Y.2002) (*"MTBE II"*); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 175 F.Supp.2d 593 (S.D.N.Y.2001) (*"MTBE I"*).

**2.** Plaintiffs defined downstream handlers as "public officials, persons and entities engaged in the storage, transport, handling, retail sale, use and response to spills of gasoline." City of Mishawaka's Fifth Amended Complaint ("Mishawaka Complaint V") ¶ 155. Plaintiffs defined defendants as "manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and/or marketers of MTBE and/or gasoline containing MTBE." *Id.* ¶ 4.

**3.** Plaintiffs' complaints were incoherent because they alleged that defendants, including some who were distributors, sellers, and suppliers, misled downstream handler defendants, some of whom were also involved in the distribution, sale, and supply of MTBE, about the dangers of MTBE. *See id.* at 41 ("Defendants misled the Plaintiff and public, including all downstream gasoline handlers, about the hazards of gasoline with MTBE."). *See also In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d at 398.

**4.** *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d at 398. Two different strategies adopted by other plaintiffs in this consolidated action could have provided the Indiana plaintiffs with a solution to the problem of contradictory allegations. *See, e.g.,* Second Amended Complaint, *Orange County Water District v. Unocal Corp., et al,* No. 04 Civ. 4968 (dividing defendants into categories of refiner defendants, supplier and manufacturer defendants, and owner/operator

## B. The Amended Complaints

Plaintiffs filed amended Complaints on June 30, 2005.[5] In these Complaints, plaintiffs alleged causes of action for (1) negligence, (2) public and private nuisance, (3) trespass, (4) damages resulting from civil conspiracy, and (5) the recovery of costs under the Indiana Environmental Legal Actions statute[6] ("IELA") against Gulf Oil LP, Lassus Bros. Oil, and 7-Eleven.[7] Plaintiffs removed previously asserted claims for products liability and failure to warn against these three defendants. The claims as to these defendants now rest on allegations that they released MTBE-containing gasoline.[8] In this way,

plaintiffs identified Gulf Oil LP, Lassus Bros. Oil, and 7-Eleven as the three downstream handler defendants.[9]

In the newly filed Complaints, plaintiffs also retained the earlier overlapping definitions of defendants and downstream handlers. Plaintiffs continued to allege that all downstream handler defendants were misled as to the potential harm of MTBE.[10]

## C. Defendants' Arguments

Downstream handler defendants now assert that the only way for plaintiffs to proceed on their claims of negligence, nuisance, trespass, recovery of costs pursuant

---

defendants and alleging claims separately as to these groups of defendants); Third Amended Complaint, *United Water New York, Inc. v. Amerada Hess Corp., et al.*, No. 04 Civ. 2389, ¶ 154 (alleging that the downstream handlers who were misled as to the dangers of MTBE by defendants' activities are *"non-defendant* persons and entities engaged in the storage, transport, handling, retail sale, use and response to spills of gasoline" and alleging that certain downstream handler *defendants* knew or should have known about the dangers of MTBE) (emphasis added).

5. *See* City of Mishawaka's Sixth Amended Complaint ("Mishawaka Complaint VI"); City of Rockport's Sixth Amended Complaint ("Rockport Complaint VI"); City of South Bend, Indiana's Fifth Amended Complaint ("South Bend Complaint V"); North Newton School Corp.'s Sixth Amended Complaint ("North Newton Sch. Corp. Complaint VI"); Town of Campbellsburg's Third Amended Complaint ("Campbellsburg Complaint III"). Because the allegations in the Indiana plaintiffs' complaints are more or less identical, for purposes of this motion, I will describe and refer to the allegations set forth in *City of Mishawaka v. Amerada Hess Corp., et al.*, No. 04 Civ.2055.

6. Ind.Code § 13–30–9–2 (2005).

7. *See* Mishawaka Complaint VI ¶¶ 211–248. Plaintiffs have alleged products liability and strict liability for failure to warn claims against all defendants *except* the three down-

stream handler defendants. *See id.* ¶¶ 189, 203. The Court will refer to defendants other than the three downstream handler defendants as "upstream handler defendants." This characterization is solely for ease of reference and does not constitute a finding of the Court.

8. *See* Plaintiffs' Memorandum of Law in Opposition to Downstream Handler Defendants' Motion to Dismiss the Indiana Complaints Pursuant to Fed.R.Civ.P. 12(b)(6) ("Opp.Mem.") at 2 ("The remaining counts of the complaints alleged against [downstream handler defendants]—common law claims for trespass, nuisance, and negligence, and a claim under the ... IELA statute—are claims arising from releases of gasoline containing MTBE that caused plaintiffs' injuries.").

9. In their motion, these defendants also characterize themselves as "downstream handler defendants." *See* Downstream Handler Defendants' Memorandum of Law in Support of Their Joint Motion to Dismiss the Indiana Amended Complaints pursuant to Fed. R.Civ.P. 12(b)(6) (filed on behalf of Defendants Gulf Oil LP, Lassus Bros. Oil, and 7-Eleven) ("Def.Mem.").

10. *See, e.g.,* Mishawaka Complaint VI ¶¶ 4–5, 155; Rockport Complaint VI ¶¶ 4–5, 152; South Bend Complaint V ¶¶ 4–5, 154; North Newton Sch. Corp. VI ¶¶ 4–5, 154; Campbellsburg Complaint III ¶¶ 4–5, 154.

to the IELA, and damages due to civil conspiracy is to rely on theories of collective liability, but that "no theory of collective liability is applicable to [downstream handler defendants]." [11] Downstream handler defendants also claim that the Complaints remain inherently contradictory and that they should be dismissed with prejudice.[12] For the following reasons the downstream handler defendants' motion is granted in part and denied in part.

## III. LEGAL STANDARD

### A. Prediction of State Law

 In a previous ruling I held that in the absence of a definitive ruling by the highest court of a particular state, this Court is called upon to predict what that court would decide when faced with an undecided issue of state law.[13] States have the primary responsibility to construe their own laws.[14] Therefore, some federal courts—especially in diversity cases—have exercised great restraint in ruling on novel issues of state law.[15] The Second Circuit has stated that the role of the federal court is to "construe and apply state law as [it] believe[s] the state's highest court would, not to adopt innovative theories that may distort established state law." [16] Courts have noted that such caution is especially appropriate when a plaintiff has chosen to bring an action in federal court.[17]

---

11. Def. Mem. at 7.

12. See id. at 6; Downstream Handler Defendants' Reply Memorandum of Law in Support of Their Joint Motion to Dismiss the Indiana Amended Complaints Pursuant to Fed. R.Civ.P. 12(b)(6) ("Reply Mem.") at 6.

13. See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 379 F.Supp.2d at 362–64, 369–70.

14. See Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) ("[T]he State's highest court is the best authority on its own law."); Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ("The authority and only authority is the State, and if that be so, the voice adopted by the State as its own (whether it be of its Legislature or of its Supreme Court) should utter the last word.").

15. See, e.g., Birchler v. Gehl Co., 88 F.3d 518, 521 (7th Cir.1996) ("We avoid speculation about trends in diversity cases: our policy will continue to be one that requires plaintiffs desirous of succeeding on novel state law claims to present those claims initially in state court.") (quotation marks and citation omitted); Pearson v. John Hancock Mut. Life Ins. Co., 979 F.2d 254, 259 (1st Cir.1992) (court's reticence not unfair to the plaintiff because plaintiff "deliberately chose to bring this action in federal court when the state courts were equally available to him. A litigant who seeks out a federal forum when a state-court forum is equally available to him cannot justi-

fiably complain if the federal court manifests great caution in blazing new state-law trails."); Villegas v. Princeton Farms, Inc., 893 F.2d 919, 925 (7th Cir.1990) (abuse of discretion to vacate judgment so that plaintiff could refile in state court, because the plaintiff "attempted to prove his novel theory in federal court, instead of giving the Illinois courts the first opportunity to address this issue"); Shaw v. Republic Drill Corp., 810 F.2d 149, 150 (7th Cir.1987) ("In the context of pendent state law claims, we have already indicated our unwillingness to speculate on any trends in state law ... [O]ur policy will continue to be one that requires plaintiffs desirous of succeeding on novel state law claims to present those claims initially in state court.").

16. City of Johnstown v. Bankers Standard Ins. Co., 877 F.2d 1146, 1153 (2d Cir.1989). Accord National Union Fire Ins. Co. of Pittsburgh v. The Stroh Companies, 265 F.3d 97, 106 (2d Cir.2001) (acknowledging a reluctance, "in the absence of clear guidance from state courts" to adopt an "innovative theory," but noting in dicta that it might be appropriate for the federal court to make a "short leap from [ ] formulations" present in existing state law to predict that the state's highest court would adopt the novel theory).

17. See, e.g., Shaw, 810 F.2d at 150 ("This policy applies with special force to a plaintiff in a diversity case who has chosen to litigate his state law claim in federal court.") (emphasis added).

Here, plaintiffs did not bring these actions in federal court in the hope of obtaining a broader interpretation of state law than they reasonably might have expected to obtain from the state. In fact, these actions were originally brought in state court but removed to federal court over plaintiffs' vigorous objections. Thus, plaintiffs sought to have a state court interpret state law and should not be prejudiced by a removal they opposed.

█ When a defendant removes a case from state to federal court, the principle of dual sovereignty requires the application of a liberal construction of state law in order to protect a party who sought to obtain a resolution of state law claims from state courts. If this Court were to adopt a more restrictive reading of state law than the highest courts of the relevant states would be likely to adopt, the parties would be treated differently than they would be in a state court—a result directly contrary to the fundamental goals of *Erie*, namely the "discouragement of forum-shopping and avoidance of inequitable administration of laws." [18]

█ In making a prediction of state law, federal courts "look to the state's decisional law, as well as to its constitution and statutes." [19] The "fullest weight" is accorded to the pronouncements of the state's highest court, while "proper regard" is given to the relevant rulings of

the state's lower courts.[20] A court may consider cases from other jurisdictions on the same or analogous issues.[21] If the state has not passed on the question, but the federal appeals court in the circuit where the state is located "has essayed its own prediction of the course of state law ... the federal courts of other circuits should defer to that holding." [22] However, a court is not bound by the relevant circuit court's decision if it is "persuaded that the holding ha[s] been superceded by a later pronouncement from state legislative or judicial sources, or that prior state court decisions had been inadvertently overlooked by the pertinent court of appeals." [23] Thus, while a court may not adopt innovative theories without support in state law, or distort existing state law, when a case is removed to federal court, the plaintiff is entitled to the same treatment it would receive in state court—no more, and no less.

### B. Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.' " [24] At the motion to dismiss stage, the issue " 'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the

**18.** *Hanna v. Plumer,* 380 U.S. 460, 468, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

**19.** *Santalucia v. Sebright Transp., Inc.,* 232 F.3d 293, 297 (2d Cir.2000).

**20.** *Travelers Ins. Co. v. Carpenter,* 411 F.3d 323, 329 (2d Cir.2005).

**21.** *See Maska U.S., Inc. v. Kansa Gen. Ins. Co.,* 198 F.3d 74, 78 (2d Cir.1999).

**22.** *Factors Etc., Inc. v. Pro Arts, Inc.,* 652 F.2d 278, 283 (2d Cir.1981).

**23.** *Id.*

**24.** *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir.2005) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

face of the pleading that a recovery is very remote and unlikely but that is not the test.' "[25]

The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."[26] When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiff's favor.[27] Although the plaintiff's allegations are taken as true, the claim may still fail as a matter of law if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief, or if the claim is not legally feasible.[28] Accordingly, a claim can only be dismissed if " 'no relief could be granted under any set of facts that could be proved consistent with the allegations.' "[29]

## C. Rules 8 and 12(e)

■ Rule 8(a) of the Federal Rules of Civil Procedure requires that the plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a) does not require "a plaintiff to plead the legal theory, facts, or elements underlying his claim."[30] "To comply with Rule 8, plaintiffs need not provide anything more than sufficient notice to permit defendant to file an answer."[31] The only requirement is that a complaint allege the "bare minimum facts necessary to put the defendant on notice of the claim so that [it] can file an answer."[32] Fair notice is " 'that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial.' "[33] This notice pleading standard "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."[34]

---

**25.** *Phelps v. Kapnolas,* 308 F.3d 180, 184–85 (2d Cir.2002) (quoting *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998)). *Accord In re Initial Public Offering Sec. Litig.,* 241 F.Supp.2d 281, 322–24 (S.D.N.Y.2003).

**26.** *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 176 (2d Cir.2004) (quotation marks and citation omitted).

**27.** *See Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.,* 369 F.3d 27, 31 (2d Cir.2004) (citation omitted).

**28.** *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, L.L.P.,* 322 F.3d 147, 158 (2d Cir.2003); *Stamelman v. Fleishman–Hillard, Inc.,* No. 02 Civ. 8318, 2003 WL 21782645, at *2 (S.D.N.Y. July 31, 2003).

**29.** *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)) (Petitioner's allegation, which included a list

of events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination, gave respondent fair notice of petitioner's claims under Title VII and the Americans with Disabilities Act and the grounds upon which they rested.).

**30.** *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) (citations omitted).

**31.** *In re Initial Public Offering Securities Litig.,* 241 F.Supp.2d at 323 (citations omitted).

**32.** *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir.2002).

**33.** *Wynder v. McMahon,* 360 F.3d 73, 79 (2d Cir.2004) (quoting *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995)).

**34.** *Swierkiewicz,* 534 U.S. at 514, 122 S.Ct. 992. *Accord Conley,* 355 U.S. at 48, 78 S.Ct. 99 ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the

Rule 8 also allows for pleading in the alternative. Rule 8(e) states in relevant part that,

> [a] party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements.[35]

Thus, plaintiffs may plead claims in the alternative, regardless of whether those claims are inconsistent.[36]

If a party contends that a pleading nonetheless "is so vague or ambiguous that [it] cannot reasonably be required to frame a responsive pleading" the party is not left without a remedy. Pursuant to Rule 12(e), the party "may move for a more definite statement before" responding to the pleading.[37]

## D. Leave to Amend

As it is "entirely contrary to the spirit of the Federal Rules ... for decisions on the merits to be avoided on the basis of such mere technicalities," leave to amend should be freely granted.[38] However, if amendment would be futile, a court can dismiss a claim without leave to amend.[39]

## E. Commingled Product Theory of Market Share Liability

■ The "commingled product theory" is a modification of market share liability, which incorporates elements of concurrent wrongdoing.[40] I have found that these consolidated MTBE cases call for the application of the commingled product theory of market share liability, in order to avoid foreclosing plaintiffs entirely from seeking relief merely because their actions did not fit the parameters of existing liability theories. In brief, this theory is appropriately applied when a plaintiff can prove that certain gaseous or liquid products (*e.g.*, gasoline, liquid propane, alcohol) of many suppliers were present in a completely commingled or blended state at the time and place that the risk of harm occurred, and the commingled product caused a single indivisible injury.

I have already found that the state courts in Indiana would relax the proximate cause requirement by applying this theory.[41] I predicted this outcome for several reasons. *First*, the Indiana Court of Appeals had demonstrated a reluctance to

purpose of pleading is to facilitate a proper decision on the merits.").

**35.** Fed.R.Civ.P. 8(e).

**36.** *See Henry v. Daytop Village*, 42 F.3d 89, 95 (2d Cir.1994) (noting that pursuant to Rule 8(e), the " 'inconsistency may lie either in the statement of the facts or in the legal theories adopted' ") (quoting 2 James Wm. Moore, Moore's Federal Practice ¶ 8.09(2) at 8–44.2).

**37.** *See also Swierkiewicz*, 534 U.S. at 514, 122 S.Ct. 992 ("If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding."); *Phillips*, 408 F.3d at 128.

**38.** *Foman v. Davis*, 371 U.S. 178, 181, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

**39.** *See Oneida Indian Nation of N.Y. v. City of Sherrill*, 337 F.3d 139, 168 (2d Cir.2003) (citing *Foman*, 371 U.S. at 182, 83 S.Ct. 227). *See also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991) ("where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice").

**40.** *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 379 F.Supp.2d at 377–79.

**41.** *See id.* at 397 (relying on *E.Z. Gas, Inc. v. Hydrocarbon Transportation, Inc.*, 471 N.E.2d 316 (Ind.Ct.App.1984)).

deny relief to a plaintiff claiming product defect based on the plaintiffs' inability to determine whose product caused the injury.[42] *Second,* the Indiana court had shown an openness to applying burden-shifting collective liabilities theories[43] in cases involving fungible products.[44] And *third,* the Indiana court expressed the view that plaintiffs may not need to establish individual fault if all suppliers followed the same standard in formulating their products.[45]

## IV. DISCUSSION

### A. Applicability of the Commingled Product Theory of Market Share Liability

Downstream handler defendants claim that the commingled product theory of market share liability does not apply to downstream handlers, but only to refiners and manufacturers.[46] Because plaintiffs have pled that they cannot identify the source of the product alleged to have caused the contamination, downstream handler defendants assert that the only way for plaintiffs to proceed is to rely on theories of collective liability. In the absence of such a theory, these defendants argue that plaintiffs have failed to state a claim upon which relief can be granted.[47] In opposition, plaintiffs argue that the commingled product theory of market share liability does apply to downstream handler defendants and that claims of negligence, nuisance, and trespass may proceed against the *downstream handler* defendants just as those claims can proceed against *upstream handler* defendants despite plaintiffs' failure to identify the offending product.[48]

Resolution of this issue requires a careful understanding of the applicability of the commingled product theory of market share liability to plaintiffs' claims. In my prior ruling, I predicted that fifteen states in this consolidated action would apply the commingled product theory of market share liability (if plaintiffs are unable to identify the offending product) to claims where product identification is essential for relief. But plaintiffs and defendants overlook the fact that this theory is not applicable where product identification is not at issue. Thus, claims of product liability and failure to warn may proceed against *upstream handler* defendants based on the commingled product theory of market share liability, despite the fact that plaintiffs cannot identify the product. Plaintiffs may also proceed on claims of negligence, nuisance, and trespass against *upstream handler* defendants in reliance on the commingled product theory of lia-

---

42. *See id.* at 396 (citing *E.Z. Gas,* 471 N.E.2d 316).

43. There are two applicable burden-shifting collective liability theories: *First,* under the theory of alternative liability, the burden of identification is shifted to the defendants where each defendant acted tortiously toward the plaintiff, one of the defendants caused the injury, but there is uncertainty as to which one. *See id.* at 373 (citing *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948)). *Second,* under the theory of market share liability, if the plaintiff establishes every element of a prima facie case except the identification of the actual tortfeasors and has joined all manufacturers who represented a "substantial share" of the product's market the burden of

identification shifts to the defendant. *See id.* at 375 (citing *Sindell v. Abbott Labs.,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980)).

44. *See id.* at 396.

45. *See id.* (citing *E.Z. Gas,* 471 N.E.2d at 321).

46. *See* Def. Mem. at 7–8; Reply Mem. at 3.

47. *See* Reply Mem. at 3.

48. *See* Opp. Mem. at 5 (citing *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d at 397).

bility, because those claims are based on allegations that upstream handler defendants acted tortiously when they produced or distributed MTBE and hinge on product identification. Finally, plaintiffs may proceed on the basis of the commingled product theory against *downstream handler* defendants where they allege claims of products liability and failure to warn against those defendants [49] because those claims also hinge on the identification of the product. However, where plaintiffs allege claims of negligence, nuisance, and trespass based on allegations of negligent handling and release of MTBE-containing gasoline, *downstream handler* defendants are liable for their actions regardless of the product's source. These claims do not hinge on the identification of the product and the commingled product theory of liability is irrelevant.

Indiana plaintiffs have not alleged product liability or failure to warn claims against the three downstream handler defendants. Thus, they need not and may not rely on theories of collective liability to proceed against these defendants.

### B. Rule 12(b)(6)

#### 1. Negligence

 Under Indiana law, a plaintiff must allege three elements in order to plead negligence:

(1) a duty on the part of a defendant to conform the defendant's conduct to a standard of care arising from the defendant's relationship with the plaintiff; (2) a failure of the defendant to conform the defendant's conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff proximately caused by the breach.[50]

In Indiana, the element of duty in a negligence claim includes a degree of foreseeability.[51] "[Indiana courts] focus on whether the person actually harmed was a foreseeable victim and whether the type of harm actually inflicted was reasonably foreseeable." [52] Thus, a court must examine what "consequences of the challenged conduct should have been foreseen by the actor who engaged in it." [53] The proximate cause requirement in Indiana also includes a degree of foreseeability. For this element, "[a] negligent act or omission is the proximate cause of an injury if [in hindsight] the injury is a natural and probable consequence which, in light of the circumstances, should reasonably have been foreseen or anticipated." [54] Thus, a negligence claim in Indiana must include some allegation of foreseeability or knowledge.

 In the newly amended Complaints, three defendants have been named

---

**49.** As a general matter, product liability claims may be alleged against downstream handlers. *See* Restatement (Third) of Torts: Products Liability § 1 (1998) ("One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect."). But, in Indiana, plaintiffs may only allege products liability and failure to warn claims against sellers when the seller is deemed to be the manufacturer of the product. A seller may be deemed to be a "manufacturer" and thus will be held liable for claims of product defect when a court is unable to exercise jurisdiction over the manufac-

turer of the product alleged to be defective. *See* Ind.Code §§ 34–20–2–3, 34–20–2–4 (2005).

**50.** *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991).

**51.** *See id.* at 997.

**52.** *Id.*

**53.** *Id.*

**54.** *Hammock v. Red Gold, Inc.*, 784 N.E.2d 495, 500 (Ind.Ct.App.2003).

as downstream handler defendants. The negligence allegations against these defendants pertain to negligent handling of MTBE-containing gasoline. The Indiana plaintiffs first alleged that the downstream handler defendants had a duty to the plaintiffs "as well as [to] all persons whom defendants' petroleum products might foreseeable harm, to exercise due care in the handling, control, disposal, sale, testing, labeling, use, warning, and instructing for use of gasoline containing MTBE." [55] Second, plaintiffs alleged that these defendants "negligently breached their duties of due care to [p]laintiffs" by releasing MTBE-containing gasoline into the environment.[56] Third, plaintiffs alleged that "[a]s a direct and proximate result of" defendants' acts or omissions "MTBE ... has posed and continues to pose a threat to groundwater and [plaintiffs'] production wells" and MTBE "required or will require" additional groundwater and well testing as it "contaminated the groundwater system and zone of influence of the area that supplies" the plaintiffs' wells.[57]

Plaintiffs have sufficiently alleged the elements of duty, breach, and injury in their negligence cause of action. Downstream handler defendants take issue only with plaintiffs' allegations of foreseeability.

Plaintiffs have alleged that the harm was reasonably foreseeable and that downstream handler defendants "should have known" or foreseen the consequences of their actions when they "negligently released MTBE into the environment." [58] However, plaintiffs also alleged that downstream handlers were misled as to the dangers of MTBE.[59] Downstream handler defendants claim that these inconsistent allegations defeat each other.[60]

However, these two allegations are not necessarily inconsistent. Nothing in the Complaints alleges that downstream handler defendants could not have *learned* of the dangers of MTBE. Indeed, the plaintiffs allege that downstream handler defendants "should have known" about the dangers, despite upstream handler defendants' "misleading communication[s]." [61] Furthermore, even if these allegations are inconsistent, this does not require dismissal. As noted, Rule 8(e) provides that alternate pleading "is not made insufficient by the insufficiency of one or more of the alternative statements." [62] Plaintiffs' claim that defendants were misled as to the dangers of MTBE does not defeat plaintiffs' alternative pleading that downstream handler defendants should have known about

**55.** Mishawaka Complaint VI ¶ 212.

**56.** *Id.* ¶ 215.

**57.** *Id.* ¶ 216.

**58.** *Id.* ¶ 214 ("At all times relevant to this litigation, [downstream handler defendants] *knew or should have known* that: unintended discharges of gasoline are commonplace; MTBE evaporates and returns via rainwater to contaminate drinking water supplies; when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances; MTBE is highly soluble in water ...; when gasoline containing MTBE is released into the environment, MTBE persists over long periods of time because MTBE is recalcitrant to biodegradation and bioremedi-

ation; very low concentrations of MTBE can ruin the taste and smell of water; MTBE is a known animal carcinogen and a possible human carcinogen; MTBE greatly increases the importance of preventing leaks of gasoline; MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE.") (emphasis added).

**59.** *See id.* at 41.

**60.** *See* Def. Mem. at 6.

**61.** *See* Mishawaka Complaint VI ¶¶ 155, 214.

**62.** Fed.R.Civ.P. 8(e).

the foreseeable consequences of their actions. Plaintiffs may still recover on this alternative theory. Accordingly, the downstream handler defendants' motion to dismiss the Indiana plaintiffs' negligence claims is denied.

## 2. Public and Private Nuisance

 Indiana defines a nuisance as "whatever is: (1) injurious to health; (2) indecent; (3) offensive to the senses; or (4) an obstruction to the free use of property; so as essentially to interfere with the comfortable enjoyment of life or property." [63] "A nuisance is classified as public if it affects an entire community or neighborhood or as private if its effect is peculiar to an individual or a limited number of individuals." [64] In addition, the Supreme Court of Indiana recently explained that "a nuisance claim is ... predicated on unreasonable interference with a public right." [65] In evaluating the unreasonableness requirement, the court stated that,

> a nuisance is an activity that generates injury or inconvenience to others that is both sufficiently grave and sufficiently foreseeable that it renders it unreasonable to proceed at least without compensation to those that are harmed. Whether it is unreasonable turns on whether the activity, even if lawful, can be expected to impose such costs or inconvenience on others that those costs should be borne by the generator of the activity, or the activity must be stopped or modified.[66]

Thus, a "nuisance claim may be predicated on lawful activity conducted in such a manner that it imposes costs on others" when "the actor intends the adverse consequences or ... is charged with knowledge of the reasonably predictable harm to others." [67]

 In their claim for public nuisance, plaintiffs alleged that defendants "knowingly unleashed massive, long-lasting and still spreading contamination of groundwater and drinking water wells" and that this "has caused and continues to cause injury to [plaintiffs] in the form of present serious interference with the use, benefit, and/or enjoyment of [their] property in a way that an ordinary, reasonable person would find a substantial inconvenience and annoyance." [68] In their claim for private nuisance, plaintiffs alleged that "gasoline and MTBE contamination caused by Defendants' conduct has damaged [plaintiffs'] property and business and unreasonably interfered with the use, benefit and enjoyment of [plaintiffs'] property." [69] Plaintiffs also alleged that the downstream handler defendants "knew or in the exercise of reasonable care *should have known* that the introduction and use of MTBE in gasoline would and has unreasonably and seriously endangered, injured, and interfered with the ordinary comfort, use and enjoyment of vital groundwater resources relied upon by [plaintiffs]." [70]

 Plaintiffs have adequately alleged the elements of both their private and public nuisance claims. Once again, defendants' only argument is that plaintiffs'

---

**63.** Ind.Code § 32–30–6–6 (2005).

**64.** *Beresford v. Starkey,* 563 N.E.2d 116, 126 (Ind.Ct.App.1990), *rev'd on other grounds,* 571 N.E.2d 1257 (Ind.1991).

**65.** *City of Gary v. Smith & Wesson,* 801 N.E.2d 1222, 1231 (Ind.2003).

**66.** *Id.*

**67.** *Id.* at 1234.

**68.** Mishawaka Complaint VI ¶¶ 220, 222.

**69.** *Id.* ¶ 231.

**70.** *Id.* ¶ 227 (emphasis added).

foreseeability allegation is contradictory.[71] Plaintiffs, however, have now identified the downstream handler defendants and alleged that these defendants should have known of the reasonably predictable harms from "actual threatened gasoline and MTBE contamination."[72] Even if this allegation contradicts plaintiffs' allegation that defendants misled the downstream handler defendants as to the dangers of MTBE, alternative statements are explicitly permitted by Rule 8(e). The downstream handler defendants' motion to dismiss the nuisance claims is therefore denied.

### 3. Trespass

 In Indiana, a plaintiff must allege two elements in order to plead trespass: "(1) the plaintiff was in possession of the land; and (2) the defendant entered the land without right."[73] In addition "a trespasser cannot be held liable unless a voluntary act caused [its] entry onto the plaintiff's property."[74] For an intentional trespass, " 'it is necessary only that the actor intentionally be upon any part of the land in question. It is not necessary that he intend to invade the possessor's interest in the exclusive possession of his land and, therefore, that he know his entry to be an intrusion.' "[75] For a reckless or negligent trespass,

[o]ne who recklessly or negligently, . . . enters land in the possession of another or causes a thing or third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or to a thing or a third person in whose security the possessor has a legally protected interest.[76]

 *First,* plaintiffs alleged that defendants "negligently, recklessly, and/or intentionally released, spilled, and/or failed to properly control, handle, store, contain, and use gasoline containing MTBE."[77] *Second,* plaintiffs alleged that defendants entered their land by causing it to be contaminated with gasoline containing MTBE and that "as a direct and proximate result of the trespass" plaintiffs were damaged.[78] Plaintiffs' allegation that downstream handlers were misled as to the dangers of MTBE is not relevant to these allegations.[79] To allege trespass, plaintiffs need only allege that defendants either (1) intentionally and unreasonably entered their land, or (2) negligently entered plaintiffs' land and that plaintiffs were damaged as a direct and proximate result of the trespass. Plaintiffs have stated a claim for trespass and the downstream handler de-

---

71. *See* Reply Mem. at 3.

72. Mishawaka Complaint ¶¶ 222, 227.

73. *Sigsbee v. Swathwood,* 419 N.E.2d 789, 799 (Ind.Ct.App.1981).

74. *Garner v. Kovalak,* 817 N.E.2d 311, 313 (Ind.App.2004).

75. *Id.* at 314 (quoting *Hawke v. Maus,* 141 Ind.App. 126, 226 N.E.2d 713, 715–16 (1967)). *Cf. Martin v. Amoco Oil Co.,* 679 N.E.2d 139, 147 (Ind.App.1997), *aff'd,* 696 N.E.2d 383, 386 (Ind.1998) (holding that plaintiffs must prove that defendant knew that the consequences complained of were "certain, or substantially certain, to result from his act" and that "if the defendant goes ahead with the act, he is treated by the law as if he had in fact desired to produce the result") (citing 1 Restatement (Second) of Torts § 158 cmt. b at 277 (1965)).

76. 1 Restatement (Second) of Torts § 165 at 300 (1965).

77. Mishawaka Complaint ¶ 235.

78. *Id.* ¶ 236.

79. *See id.* at 41.

fendants' motion to dismiss the trespass claims is denied.

### 4. Civil Conspiracy

■■■ Under Indiana law, a civil conspiracy is "a combination of two or more persons who engage in concerted action to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means." [80] "Allegations of a civil conspiracy are just another way of asserting concerted action in the commission of a tort." [81] In addition, "one cannot agree, expressly or tacitly, to commit a wrong about which he or she has no knowledge, [thus] in order for [a] civil conspiracy to arise, the parties must be aware of harm or wrongful conduct at [the] beginning of [the] combination or agreement." [82]

■■ In their cause of action for damages due to civil conspiracy, plaintiffs alleged that the downstream handler defendants carried out their conspiracy by "intentionally misrepresenting to the [Environmental Protection Agency] and the public that MTBE was safe and did not pose a risk to groundwater, concealing the dangers of MTBE from the government and public ... concealing the dangers of MTBE from Downstream Handlers," fighting underground storage tank legislation, and deciding to use MTBE rather than other oxygenates.[83] Plaintiffs' cause of action for damages resulting from civil conspiracy alleged that downstream handler defendants *actually knew* about the hazards which MTBE

posed to groundwater throughout Indiana, including [plaintiffs'] water system." [84]

Though they were given clear instructions to remedy their contradictory allegations, plaintiffs have again alleged that downstream handlers are both the victims of a civil conspiracy and the parties responsible for the civil conspiracy.[85] In addition, civil conspiracy requires proof of specific intent. Plaintiffs cannot allege this with respect to the downstream handler defendants, because plaintiffs have explicitly alleged that defendants carried out their conspiracy by "concealing the dangers of MTBE from Downstream Handlers." [86] Thus, any further amendment would be futile. Plaintiffs' claims against the downstream handler defendants for damages resulting from civil conspiracy are dismissed with prejudice.

### 5. Indiana Environmental Legal Actions

■■ Plaintiffs claim that the "IELA imposes liability for releases of petroleum into soil and groundwater without respect to the releasor's knowledge or state of mind." [87] Section 13–30–9–2 of the Indiana Code states that a plaintiff:

> may bring an environmental legal action against a person who caused or contributed to the release of a hazardous substance or petroleum into the surface or subsurface soil or groundwater that poses a risk to human health and the environment to recover reasonable costs

**80.** *Boyle v. Anderson Fire Fighters Assoc. Local 1262,* 497 N.E.2d 1073, 1079 (Ind.App. 1986).

**81.** *Id.*

**82.** 16 Am.Jur.2d *Conspiracy* § 51 at 277 (2004).

**83.** Mishawaka Complaint VI ¶ 241.

**84.** *Id.* ¶ 239 (emphasis added).

**85.** *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d at 398.

**86.** Mishawaka Complaint VI ¶ 241.

**87.** Opp. Mem. at 3.

of a removal or remedial action involving the hazardous substances or petroleum.

This statute requires only that a defendant has "caused or contributed to" the contamination, and does not require a plaintiff to prove that a defendant "expected or intended any contamination, or even that [it] acted negligently."[88] Here, plaintiffs allege that the downstream handler defendants "caused or contributed to the release" of MTBE-containing gasoline.[89] Because this allegation is sufficient to state a claim under the IELA, the downstream handler defendants' motion to dismiss the Indiana plaintiffs' claims under the IELA is denied.

## C. Rules 8 and 12(e)

▮ The downstream handler defendants also argue that the claims against them must fail under Rule 8's liberal pleading standard.[90] Each of the downstream handler defendants owned multiple stations and ownership of those stations varied over time. The downstream handler defendants claim that plaintiffs must identify "which location is at issue" and the "relevant time period" for each release in order for defendants to assess their liability and respond to the complaints.[91] Plaintiffs argue that their claims alleging releases of gasoline and/or gasoline containing MTBE that harmed them were pled with sufficient specificity pursuant to Rule 8.[92]

Plaintiffs alleged that downstream handler defendants "knowingly unleashed massive, long-lasting, and still spreading contamination of groundwater and drinking water wells"[93] and that these defendants "released, spilled, or failed to properly control, handle, store, contain, and use gasoline containing MTBE."[94] In light of Rule 8's liberal pleading standard, I find that plaintiffs have adequately pled their claims of negligence, public and private nuisance, trespass, and recovery of costs under the IELA as to the downstream handler defendants.

But to the extent that these defendants genuinely feel that more specificity is required, they are not left without a remedy. As the Supreme Court has stated, if the pleadings fail to specify the allegations in a manner that provides sufficient notice, downstream handler defendants may make a motion for a more definite statement pursuant to Rule 12(e).[95]

In that regard I note that, although plaintiffs have claimed that they cannot identify the specific "manufacturer of any given quantity of gasoline that was the source of MTBE found in a well or groundwater"[96] they have not alleged that they cannot determine where and when negligent releases of gasoline and/or MTBE-containing gasoline caused their injuries. If downstream handler defendants move for a more definite statement, plaintiffs will be required to identify when and where they were injured by these defen-

**88.** *Armstrong Cleaners, Inc. v. Erie Ins. Exch.,* 364 F.Supp.2d 797, 811 (S.D.Ind.2005).

**89.** Mishawaka Complaint VI ¶ 247.

**90.** *See* Reply Mem. at 3–4.

**91.** *Id.* at 4, 6.

**92.** *See* Opp. Mem. at 4–6 (claiming that discovery not dismissal is the proper way to test these allegations).

**93.** Mishawaka Complaint VI ¶¶ 215, 220.

**94.** *Id.* ¶ 235.

**95.** *See Swierkiewicz,* 534 U.S. at 514, 122 S.Ct. 992.

**96.** Mishawaka Complaint VI ¶ 183.

dants' releases or threatened releases of gasoline and/or MTBE-containing gasoline.[97] Plaintiffs will likely be required to identify the approximate location of contaminated or threatened water wells and the plumes of MTBE [98] that contaminated those wells.[99]

In turn, once the Indiana plaintiffs identify the approximate location and dates of their injuries, the downstream handler defendants are in the best position to identify when and where gasoline releases occurred to cause these injuries. Defendants will be required to identify the leak sites and the stations that contributed to the alleged underground plumes of contamination or threatened contamination in or around plaintiffs' wells.

## V. CONCLUSION

For the reasons set forth above, the downstream handler defendants' motion to dismiss the Indiana complaints is granted in part and denied in part. Plaintiffs have stated cognizable claims for negligence, public and private nuisance, trespass, and recovery of costs under the IELA as to the downstream handler defendants. Plaintiffs' claims of damages resulting from civil conspiracy as to the downstream handler defendants are dismissed with prejudice. The Clerk of the Court is directed to close this motion [docket # 766]. A conference

is scheduled for November 15, 2005, at 4:30 p.m. in Courtroom 15C.

SO ORDERED.

## ORDER

### *CASE MANAGEMENT ORDER #14*

This Order resolves the following motions:

- Defendants' Motion to Compel United Water of New York ("UWNY") to Explain its Corporate Status (10/20/05)
- Defendants' Motion to Compel UWNY to Produce Documents Responsive to Defendants' First Request for Production (10/20/05)
- Exxon Mobil Corporation's ("Exxon-Mobil") Motion for Costs and Fees (10/27/05)
- UWNY's Cross-Motion for Sanctions (10/28/05)
- Suffolk County Water Authority's Request for an Extension to File its Motion on Causation (10/28/05)

I. *United Water of New York v. Amerada Hess Corp., et al.*

1. UWNY shall produce (1) a Rule 30(b)(6) witness to testify regarding its corporate structure, if ExxonMobil serves an appropriate notice requesting such a deposition; (2) a chart on the organization-

---

**97.** For example, plaintiffs pled that "defendants' conduct ... continues to injure the property, health, safety, and/or comfort of a ... considerable number of persons in the State of Indiana" and that plaintiffs incurred "additional testing costs, loss of water production capacity and loss of consumer confidence arising out of the ... public perception ... that the water supply has been rendered less certain, safe and reliable relative to other sources of water" due to gasoline and MTBE contamination. *Id.* ¶¶ 224–227. Plaintiffs must eventually identify how and when downstream handlers caused these injuries.

**98.** The EPA defines a "plume" as "a visible or measurable discharge of a contaminant from a given point of origin. [It c]an be visible or thermal in water, or visible in the air as, for example, a plume of smoke." The Environmental Protection Agency, Terms of Environment: Glossary, Abbreviations and Acronyms, available at http://www.epa.gov/ OCEPA-terms/pterms. html (last updated Aug. 29, 2005).

**99.** *See* Mishawaka Complaint VI ¶ 3.

al structure of its corporate family; and (3) a witness to testify as to UWNY's efforts to locate and produce responsive materials to ExxonMobil's first request for the production of documents.

2. In response to ExxonMobil's Document Request No. 24, seeking "all documents provided by UWNY to its customers concerning water quality and/or MTBE or TBA," UWNY shall produce (1) any letters it maintains to or from customers regarding MTBE and/or TBA; (2) Water Quality Reports issued prior to May, 2001 if any are found; (3) the Bates numbers for documents already produced regarding UWNY's Customer Advisory Panel.

3. Sheng-Lu Soong shall be produced for deposition by UWNY on January 19 and 20, 2006.

4. ExxonMobil's Motion for costs, expenses and reasonable attorney's fees in connection with its Motion to Compel Sheng-Lu Soong's Deposition Attendance is denied.

5. UWNY's Motion for costs, fees, and sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure is denied.[1]

II. *Suffolk County Water Authority v. Amerada Hess Corp., et al.*

1. Suffolk County Water Authority shall not be limited by CMO #4's restriction on discovery to Relevant Geographic Areas, in conducting discovery targeted to

its Motion on the Applicability of Causation Theories. Any remaining issues relating to the non-party deposition of Kinder Morgan and its employees are referred to Special Master Ken Warner.

2. Suffolk County Water Authority shall file its Motion on the Applicability of Causation Theories by December 16, 2005. Defendants' response is due January 27, 2006 and the reply is due February 13, 2006. All page and exhibit limitations apply.

SO ORDERED.

---

[1] While Rule 37 sanctions are not warranted at this time the parties are reminded that "[t]he discovery system depends absolutely on good faith and common sense from counsel. The courts, sorely pressed by demands try cases promptly and to rule thoughtfully on potentially case dispositive motions, simply do not have the resources to police closely the operation of the discovery process. The whole system of Civil adjudication would be ground to a virtual halt if the courts were forced to intervene in even a modest percent-

age of discovery transactions. The fact should impose on counsel an acute sense of responsibility about how they handle discovery matters. They should strive to be cooperative, practical and sensible, and should turn to the courts (or take positions that force others to turn to the courts) only in extraordinary situations that implicate truly significant interests." *In re Convergent Technologies Sec. Litig.*, 108 F.R.D. 328, 331 (N.D.Cal. 1985)(Mag. Judge Wayne D. Brazil).